Gregory A. WISHOP, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1023.

District of Columbia Court of Appeals.

Submitted July 8, 1987.

Decided Oct. 8, 1987.

Thomas R. Kennedy, Washington, D.C., appointed by this court, was on the brief, for appellant.

Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Mary Ellen Abrecht, Natalia M. Combs, and Clifford T. Keenan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

Clyde Smith and Gregory Wishop were jointly convicted of distributing two controlled substances, phencyclidine (PCP) and marijuana, in violation of D.C.Code § 33–541(a)(1) (1986 Supp.). Wishop's sole contention before this court[1] is that the trial court committed plain error in instructing the jury that the government must prove beyond a reasonable doubt that he distributed a "measurable or usable amount of a controlled substance." We reject his argument and affirm the conviction.

I

The evidence showed a fairly typical street-corner sale of drugs by the two defendants to an undercover police officer. After Wishop indicated to the officer, Paul Sinclair, that he had PCP for sale, Sinclair told Wishop that he wanted to make a purchase. Wishop then turned to Smith, who was just coming out of a nearby house, and spoke with him. Smith beckoned to Sinclair, and when Sinclair went over to him, Smith gave Sinclair a tinfoil packet in exchange for $15. Smith then went back into the house, and Sinclair left the area, noting that Wishop was still "standing around" a short distance down the street. Officer Sinclair broadcast lookouts for Wishop and Smith, and moments later they were both arrested.

The contents of the tinfoil packet were later analyzed by a chemist from the Drug Enforcement Administration. According to the chemist's report, which was introduced into evidence and read to the jury, the packet contained 461.6 milligrams of plant material, consisting of "phencyclidine on marijuana." The net weight of the phencyclidine was 19.4 milligrams, or 4.2 percent of the total.[2]

---

1. Both Smith and Wishop appealed from their convictions, but Smith withdrew his appeal.

2. Appellant asserts that the chemist's report "did not distinguish between the amount of phency-

An expert witness testified, without objection from either defense counsel, that PCP was normally sprinkled on marijuana, oregano, or parsley and smoked in a hand-rolled cigarette. The expert, Detective Steven Finkelberg, also stated—again without objection—that 461.6 milligrams of marijuana treated with PCP was "definitely" a usable amount,[3] and that PCP was sold on the street "in a tinfoil like this [referring to the packet sold to Officer Sinclair] of approximately fifteen dollars."

## II

Appellant contends that the trial judge erred when he instructed the jury that "in order to establish the first essential element of the offense, the government must prove beyond a reasonable doubt that the defendant transferred or attempted to transfer some measurable or usable amount of a controlled substance." He maintains that the term "measurable" should not have been included in the instruction because it enabled the government to avoid proving that there was a "usable" amount of each of the two controlled substances, as the law requires. At trial, however, defense counsel did not object to the instruction as given.[4] Consequently, appellant must demonstrate plain error before we may reverse his conviction, i.e., error "so clearly prejudicial to [appellant's] substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted). We find no plain error.

In *Edelin v. United States*, 227 A.2d 395 (D.C.1967), this court held for the first time that the government, in a narcotics case, must prove that the defendant possessed a "usable" quantity of narcotics.

Part of the Government's prima facie case is to prove that a substance in defendant's possession allegedly in violation of [D.C.Code § 33–402(a) (1961), a predecessor of the current narcotics laws] is proscribed as a narcotic drug under the statutory scheme of narcotics control. If this substance cannot be sold, if it cannot be administered or dispensed, common sense dictates that it is not such a narcotic as contemplated by Congress to be a danger to society, the possession of which is proscribed.

We ... hold that where there is only a trace of a substance, a chemical constituent not quantitatively determined because of minuteness, *and* there is no additional proof of its usability as a narcotic, there can be no conviction under § 33–402(a).

*Id.* at 398–399 (emphasis added). We have consistently followed *Edelin* in numerous other cases over the last twenty years. *E.g., Harris v. United States*, 489 A.2d 464, 470 (D.C.1985); *Hawkins v. United States*, 482 A.2d 1230, 1233 (D.C.1984); *Blakeney v. United States*, 366 A.2d 447, 448–449 (D.C.1976); *Jones v. United States*, 318 A.2d 888, 889 (D.C.1974); *Payne v. United States*, 294 A.2d 501, 502–503 (D.C.1972); *see also Hinton v. United States*, 137 U.S.App.D.C. 388, 394, 424 F.2d 876, 882 (1969). Although the defendants in all of these cases, including *Edelin* itself, were charged only with possession of narcotics (or, in *Hinton*, with its federal

---

clidine and the amount of marijuana, but merely described the combination of the two as a dangerous drug, net weight 19.4 milligrams." We disagree. Fairly read, the chemist's report established that 19.4 milligrams—or 4.2 percent of the total amount of 461.6 milligrams—was phencyclidine, and that the rest (95.8 percent) was marijuana.

3. Detective Finkelberg testified as follows:
   Q. [by the prosecutor]: ... Detective Finkelberg, assuming that the net weight of what was in that tinfoil that you just opened up was 19.4 milligrams, would that be a usable amount?

A. Yes. I am sure that is more than 19.4 milligrams, though.
   THE COURT: You mean the weight of the entire substance or the weight of the controlled substance?
   MS. COMBS [the prosecutor]: The weight of the controlled substance. If the weight of that entire substance in that tinfoil, assuming that was 461.6 milligrams, is that a usable amount?
   THE WITNESS: Definitely.

4. Appellant is represented by different counsel on this appeal.

equivalent) whereas the case at bar involves distribution rather than mere possession,[5] we see no reason not to apply the "usable quantity" rule of *Edelin* to a distribution case as well.

■ The government asserts in its brief that under District of Columbia law "a measurable amount of a controlled substance *is* a usable amount" (emphasis in original). That is not what *Edelin* says. *Edelin* holds only that if the quantity of a drug is too small to be capable of quantitative analysis, there must be "additional proof of its usability as a narcotic" in order to sustain a conviction. 227 A.2d at 399. Implicit in this holding is the converse proposition that if the quantity is more than a trace, and therefore measurable, "additional" proof of usability may not be necessary (though of course it is not prohibited, and in some cases the facts may require it). Thus, although the two terms are not synonymous as the government asserts, the fact that a drug is measurable tends to show that it is also usable.[6] "*Edelin* went no further than to recognize in the common sense application of the statute that where the seized substance is 'of an amount so inconsiderable as to make it of no utility to a user and unmarketable, it is not such a narcotic as contemplated by Congress to be a danger to society." *Blakeney v. United States, supra*, 366 A.2d at 449 (citation omitted).

■ The instruction at issue in this case was potentially confusing because it implied that the government had to prove that the quantity of drugs was *either* measurable *or* usable. This is plainly incorrect. *Edelin* and its progeny make clear that the critical requirement is usability, not mea-

surability. Of course, as we have said, the fact that a drug is measurable—*i.e.*, capable of quantitative analysis—will usually suffice to prove that it is usable. *Edelin* makes this clear by requiring "additional proof" of usability only when the amount of the drug is too small to be measured.[7] The instruction would have been more accurate if it had made clear that the government must prove there was a usable quantity of each drug charged, and that measurability could be regarded as evidence of a usable quantity, along with any other evidence bearing on the issue of usability. Instructions in future cases should reflect this distinction and focus the jury's attention on usability as a necessary element of proof, which the government has the burden to establish beyond a reasonable doubt.[8]

Nevertheless, we are satisfied that the instructions, read as a whole, were sufficient to inform the jury of the elements of the crime and the government's burden of proof. Super.Ct.Crim.R. 30, like its identical federal counterpart, requires a timely objection to an instruction before a party "may assign as error any portion of the charge or omission therefrom...." The purpose of this requirement "is to afford the trial court an opportunity to correct any instructional defect and thereby avoid error which otherwise might necessitate a new trial." *Watts v. United States, supra*, 362 A.2d at 708 (citations omitted); *accord, e.g., Johnson v. United States*, 387 A.2d 1084, 1089 (D.C.1978) (en banc). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S.

---

5. To this extent the instant case appears to be one of first impression in the District of Columbia.

6. Usability can also be established by other means—by expert testimony, for example, as in this case.

7. Thus, if the evidence in a given case failed to show measurability, and there were no "additional proof" of usability, the defendant would be entitled to a judgment of acquittal before the case even went to the jury.

8. In the federal courts, by contrast, the government is required to prove only a measurable quantity, rather than a usable quantity. *See United States v. Jeffers*, 524 F.2d 253, 256–258 (7th Cir.1975). If we were writing on a clean slate, there would be nothing to prevent us from following *Jeffers* and similar federal precedents, assuming of course that we found them persuasive. With *Edelin* on the books, however, this division of the court is precluded from doing so by *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971).

145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (footnote omitted).

This is not one of those rare cases. The chemist's report and Detective Finkelberg's testimony, both of which were uncontroverted, showed that there was both a measurable and a usable amount of each drug in the tinfoil packet. The fact that the drugs were actually measured, as the chemist's report disclosed, was obvious evidence of their measurability. The fact that the drugs were offered for sale in a quantity and in a container similar to those in which such drugs were usually sold on the street was further evidence of their usability. Viewing the record as a whole, we see no danger that the jury could reasonably have been misled by the challenged instruction. The judgment of conviction is accordingly

*Affirmed.*

STEADMAN, Associate Judge, concurring:

I concur in the result because I agree that whatever the correct law is as to measurability/usability, there is no plain error here.

However, I do not agree with the majority's application of the *Edelin* principle. That case interpreted Congressional concern as focusing on future sale or administration of the proscribed substance by the possessor. Hence, "if this substance cannot be sold, if it cannot be administered or dispensed," then "common sense" dictates that its possession does not fall within the statute. Thus, we held that "where there is only a trace," the government must show that it is nonetheless usable; *i.e.*, that it can be "sold ... administered or dispensed." [1] This requirement has been perhaps imprecisely referred to in our subsequent cases as "usability", a peculiarity that at the last readily available count we share with only four states. *See* Note, *Criminal Liability for Possession of Nonusable Amounts of Controlled Substances*, 77 COLUM.L.REV. 596 (1977).

If in fact a controlled substance is sold in the marketplace, then by definition it is "usable" for purposes of sale and falls within D.C.Code § 33–541(a). (I would apply the principle to all the activities proscribed in that section.) *Edelin* and its progeny are dealing with an interpretation of legislative intent.[2] "Common sense" says to me that Congress and the District of Columbia Council did not intend to make licit an active local market in controlled substances, particularly where sold in plainly measurable quantities, as here.

This same line of thought is expressed in several recent cases from California, at least formerly a leading "usability" jurisdiction. In *People v. Hardin*, 149 Cal. App.3d 994, 995, 197 Cal.Rptr. 194, 195 (1983), the court held that "defendant was properly convicted [of sale of a controlled substance] without a jury instruction to the effect that to constitute the crime a usable amount of methamphetamine must have been present in the substance sold." Several grounds underlay this holding,[3] includ-

---

1. *Edelin* referred to the substance's usability "as a narcotic." 227 A.2d at 399. At least in the context of a sale, I read that phrase as simply requiring that the quantity be sufficient to pass in the market and induce purchase "as a narcotic." That the *Edelin* concern relates to both use and sale is reiterated in *Blakeney v. United States*, 366 A.2d 447, 449 (D.C.1976), where we said:

   *Edelin* went no further than to recognize in the common sense application of the statute that where the seized substance is of an amount so inconsiderable as to make it of no utility to a user *and unmarketable*, it is not such a narcotic as contemplated by Congress to be a danger to society. (Emphasis added.)

2. *Edelin* was decided under a provision of a statute, enacted by the Congress, dealing with "narcotic drugs," and understandably dealt with that concept. *See* D.C.Code § 33–501 *et seq.* (1981). In 1981, the D.C. Council enacted a sweeping overhaul of existing legislation by passage of the "District of Columbia Uniform Controlled Substances Act of 1981," D.C.Code § 33–501 *et seq.* (1987 Cum.Supp.). I assume for present purposes that no change was effected with respect to the "usability" requirement, but some of the terminology used in the *Edelin* line of cases may now be inapposite.

3. The case also refers to the wording of the California statutes, which included the phrase "any quantity", and in that regard is distinguishable.

ing, as explained in a subsequent case, the fact that "the requirement that 'usable quantity' be proven applies to simple possession cases, not to cases of sale." *People v. Mata*, 180 Cal.App.3d 955, 959, 226 Cal.Rptr. 150, 152 (1986). On this point, the two cases in turn rely on an extended discussion in *People v. Diamond*, 10 Cal. App.3d 798, 89 Cal.Rptr. 126 (1970), distinguishing sale cases from possession cases and asserting that "[p]roof of the intentional sale of a dangerous drug is proof the quantity sold was 'usable for sale'." *Id.* at 801, 89 Cal.Rptr. at 127.

I might add that I also harbor considerable doubt about the proper application of the *Edelin* principle even to cases of possession of more than a "trace" of a controlled substance. I would not reach that issue in disposing of the case before us.