**Marion L. SINGLEY, Appellant,**

v.

**UNITED STATES, Appellee.**

**Henry C. KIBLER, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 85–1064, 85–1079.

District of Columbia Court of Appeals.

Argued June 1, 1987.

Decided Nov. 5, 1987.

Adam Ambrose, Silver Spring, Md., appointed by this court, for appellant Marion L. Singley.

Joseph H. Green, Jr., Washington, D.C., for appellant Henry C. Kibler.

Michael B. Hull, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and John P. Dominguez, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and ROGERS, Associate Judges and NEBEKER,[*] Associate Judge, Retired.

PER CURIAM:

Following their joint jury trial, appellants Marion Singley and Henry Kibler were each convicted of one count of distribution of a controlled substance (cocaine) in violation of D.C.Code § 33–541(a)(1) (1986 Supp.). Singley was also convicted of one count of possession of a controlled substance (heroin). *Id.* § 33–541(d). On appeal Singley contends that she was entitled to a judgment of acquittal on the heroin charge because the government failed to prove that she possessed a usable amount. Singley and Kibler each contend that the trial judge abused his discretion in denying a requested missing witness instruction. We agree that there was insufficient evidence to support Singley's conviction for possession of heroin.

I

The evidence adduced at trial showed that in February of 1984, Lorenzo Mosley contacted United States Park Police Detective Ronald Schmidt and offered information about a woman selling cocaine in Southeast Washington, D.C. The information was provided by Mosley in an effort to arrange a plea agreement on a drug charge then pending against him in Virginia. On February 16, 1984, Mosley met with Schmidt and Richard White, an undercover Park Police officer, and they devised a plan for White to accompany Mosley to Singley's house and for White to purchase cocaine from Singley. White and Mosley then drove to Singley's house, where Mosley entered Singley's apartment alone. Singley and Mosley then returned to the car and left; White was driving, Singley sat in the front seat, and Mosley sat in the back seat. White was wired with a transmitter for his safety, which he used to pass the directions given to him by Singley to a police surveillance team.

Singley directed White to the corner of Sixteenth and W Street, S.E. She then got out of the car and walked towards an apartment complex. When she returned to the car alone in about five minutes, she told them that the people she was dealing with did not trust her with the drugs and that they first wanted her to bring the money to them. White showed Singley $1,000, and told her he wanted to inspect a bag of cocaine before giving any money. Singley left again and returned about five minutes later with appellant Kibler.

Singley then got into the front passenger seat of Mosley's car. When Kibler started to get in the back seat, White stopped him, saying that he was dealing directly with Singley. Kibler eventually handed Singley, through the car window, an open green napkin containing crystalline white powder. Singley passed the napkin to White, who visually confirmed that the powder was cocaine and said, "this stuff looks good." These were White's prearranged code words to alert the police backup team, which arrived approximately one minute later and arrested Singley and Kibler. White and Mosley were also arrested to protect their cover. A search of Singley incident to the arrest revealed a small tinfoil packet containing white powder that field-tested positive for heroin.

Appellant Kibler did not testify. He called two nieces, who offered alibi testimony. Singley testified that she had engaged in this transaction, in response to several phone calls from Mosley and in exchange for the heroin, only to connect Mosley with some dealers. On February 16, Mosley

---

[*] Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

called Singley several times, told her he would give her heroin in exchange for her help, and eventually told her he was coming over. Singley also stated, and offered corroboration by another witness, that Mosley handed her a small foil packet in the apartment. She further testified that, at Sixteenth and W Street, she had come back to the car with Kibler only to get him a cigarette, and that White had produced the cocaine on his own.

## II

Singley contends that the evidence was insufficient to support her conviction for possession of heroin because the government failed to prove she possessed a usable amount of the substance. The chemical analysis of the 70 milligrams of white powder indicated that it contained only a "small amount" of heroin. The relevant expert testimony proceeded as follows:

COURT: Is there any reflection as to what amount of the substance is heroin?

BROWN: There is not, Your Honor.

\* \* \* \* \* \*

THE PROSECUTOR: Now, Detective Brown, have you ever reviewed results of a chemical analysis that from the Drug Enforcement Agency that indicated the controlled dangerous substance is found in trace amounts?

BROWN: Yes.

THE PROSECUTOR: What does that mean?

BROWN: Merely exactly what it represents, traces or residue. Such a minimal of the amount of the substance that it is unable to be quantitated or measured.

THE PROSECUTOR: *Now, in your opinion, would a powder containing trace amounts be usable?*

BROWN: *No.*

THE PROSECUTOR: Now, the results of the analysis on this case with regard to heroin indicates what words?

BROWN: Small amounts.

THE PROSECUTOR: *In your opinion do you know whether small amounts is different from trace amounts?*

BROWN: *I do not.*

\* \* \* \* \* \*

THE PROSECUTOR: Are you able to determine line item number two which is part of government's number one [exhibit], seventy milligrams of powder containing heroin in small amounts is a usable amount for a person who is going to snort it?

BROWN: Let me best relate in this fashion, seventy milligrams of powder containing small amounts of heroin is a usable amount in this respect and I want to make it very clear that seventy milligrams of powder is a usable amount of a compound substance but, in reference to the heroin contents of small amounts, *I am unable to render an opinion as to whether the heroin itself would be a usable amount of the substance.* [Emphasis supplied.]

At the close of all the evidence, the trial judge denied Singley's motion for judgment of acquittal on the ground that the jury "can conclude from [the small amount] that from all that has been said that there was some measurable amount and measurable being equivalent to usable amount, *not any discernible effect* but, amount of heroin that could be measured and is something more than a trace." (Emphasis supplied).

In the District of Columbia, a conviction for possession of narcotics cannot be sustained "where there is only a trace of a substance, a chemical constituent not quantitatively determined because of minuteness, and there is no additional proof of its usability *as a narcotic.*" *Edelin v. United States,* 227 A.2d 395, 399 (D.C.1967) (traces found on paraphernalia) (emphasis supplied); *compare Blakeney v. United States,* 366 A.2d 447, 448–49 (D.C.1976) (statute proscribes possession of marijuana itself, not constituent narcotic element). It is only with reference to "narcotic effect" that the usability of an amount of heroin can be assessed. *See Edelin, supra,* 227 A.2d at 399. The fact that the chemical is found in a substance rendering it physically capable of being introduced into the system is, in itself, irrelevant: a nonusable amount

cannot be made usable simply by adding a matrix powder.[1]

■■■ This court cannot assume[2]—and a jury could not reasonably and consistently infer from Officer Brown's testimony—that Singley possessed a usable amount of heroin. Brown stated that a trace amount is insufficient to produce a narcotic effect, but the trial judge apparently found this concession to be immaterial. *Edelin* requires, however, that the amount of the substance be sufficient to produce a narcotic effect. A drug found in a substantial amount is still "usable" even if a simple step has to be performed—such as rolling and lighting a marijuana cigarette, mixing a solution and injecting it with a hypodermic, mixing a narcotic with a matrix powder, or adding a simple secondary substance—before it produces a narcotic effect. But a trace amount is insufficient to convict whenever it cannot produce a narcotic effect in any form. *See id.; State v. Moreno*, 92 Ariz. 116, 120, 374 P.2d 872, 875 (1962) (en banc) ("incapable of being put to any effective use").

Brown testified that a powder containing "trace" amounts would not be usable and went on to state specifically that he did not know whether a "small" amount was different from a "trace" amount. Therefore, because he had no conception whatsoever of the amount involved, he could not possibly have known whether a "small" amount produces a narcotic effect. A conviction cannot rest solely on police speculation and guesswork. The only reasonable explanation for the conviction is that the jury simply relied on Brown's conclusory statements without scrutinizing its logical underpinnings. Self-contradictory and confusing testimony, however, cannot furnish sufficient evidence for a criminal conviction.[3]

Besides being inapposite as a matter of law, the government's interpretation of Brown's comments—that Brown was simply unable to opine whether the small amount itself was usable—places a forced and unsupported clarification or gloss on the testimony, which the jury could not reasonably have been expected to understand.[4] Brown expressly stated that a trace amount was unusable and that he had no knowledge as to whether a small amount was any different.

No reliance can be placed by the trier of fact on Singley's intended usage. Her subjective intentions alone are irrelevant to the actual contents of the powder. In other words, her intention is not evidence that the substance is usable as a "narcotic," in contrast with some other use. Obviously, she could not be convicted if the substance which she was snorting was talcum powder. Because erroneous intent and common practice are insufficient to convict if the substance is not in fact illegal, the inquiry must be confined to the chemical contents of what she possessed.[5]

1. In argument before the trial judge, the prosecutor conceded that the government was "not able to prove whether this heroin is in a concentration that would have a discernable narcotic effect."

2. In reviewing the sufficiency of the evidence, this court must view the evidence in the light most favorable to the government, *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984), including all reasonable inferences in the government's favor. *Blackledge v. United States*, 447 A.2d 46, 49 (D.C.1982).

3. If Brown inadvertently created the wrong impression, the government should at least be put to the burden of eliciting a more precise clarification. It cannot rely quietly on a conclusion not supported by the testimony, particularly where there is confusion over the meaning of "usability."

4. Indeed, even the trial judge suggested he had misunderstood Brown's testimony: he was sufficiently confused as to the meaning of usability and the materiality of a discernable narcotic effect to require the testimony to be reread before ruling on the motion for judgment of acquittal.

5. The government can readily meet its burden of proof either by performing more sensitive or precise tests or by adopting a uniform terminology that is keyed to the usability (narcotic effect) of a particular substance. Here, a "small" amount might very well have been different from a "trace" amount, and have been usable. But given Brown's knowledge and the use of an erroneous legal standard, the jury could only speculate.

## III

■ Appellants also contend that the trial judge abused his discretion when he refused to give a missing witness instruction because of the government's failure to produce Lorenzo Mosley. The two prerequisites to the giving of a missing witness instruction are (1) that the witness' testimony is likely to elucidate the transaction at issue, and (2) that the absent witness is peculiarly available to the party against whom the adverse inference is sought to be drawn. *Miles v. United States,* 483 A.2d 649, 657 (D.C.1984); *see also German v. United States,* 525 A.2d 596, 611 (D.C. 1987). Even where both pre-conditions are met, the trial judge retains the discretion to refuse the instruction. *Miles, supra,* 483 A.2d at 658. Essentially, it is left to the trial judge to determine whether, considering all the circumstances, "an inference of unfavorable testimony is a natural and reasonable one." *Thomas v. United States,* 447 A.2d 52, 58 (D.C.1982). This determination will be upheld on appeal absent a clear abuse of discretion. *See Leftwich v. United States,* 460 A.2d 993, 995 (D.C. 1983).

Without determining whether the elucidation[6] or availability[7] prongs have been technically satisfied, we conclude that the denial of the instruction did not constitute an abuse of discretion. The facts do not compel the finding that the failure to produce Mosley should be considered evidence that he would have contradicted the government's version of the events. *See Cooper v. United States,* 415 A.2d 528, 534 (D.C.1980) ("we risk considerable unfairness by using the missing witness instruction to create adverse evidence"). First, the failure to call Mosley does not engender any legitimate suspicion because he could not aid the government's case in any meaningful way. Officer White's testimony was sufficient to show a sale of cocaine. The jury was presented with Singley's testimony, but could nonetheless infer that she was a participant in the sale. With respect to the less important issue of the source of the cocaine, the police search of Mosley before the trip to Singley's apartment is enough for the trial judge to believe that it was unlikely that Mosley had any cocaine to give to Singley. (If Mosley had given her the cocaine, he would likely invoke the fifth amendment privilege against self-incrimination.) Second, Mosley was only a temporary informant whose work for the Park Police ceased immediately after this incident; the department did not have enough grounds immediately after the arrest to believe that his testimony would be needed. Third, the police did make some efforts to locate Mosley. Finally, even though Singley testified that she did not know how Mosley could be contacted, defense counsel did not otherwise make an adequate proffer that counsel had made reasonably thorough efforts to locate Mosley. Under all of these circumstances, the trial judge permissibly could believe that the failure of the police to employ more rigorous efforts in search of Mosley was not enough to show that the government did not want to locate Mosley.[8]

---

**6.** The trial judge seems to have assumed that the elucidation requirement had been satisfied. Singley offered unrebuttable testimony—relevant to her entrapment defense and her agreement with Mosley—with respect to the telephone conversations and her encounter with Mosley at her apartment. Moreover, because Mosley was a temporary informant who used to be friends with Singley, this court cannot assume that Mosley's account of the actual transaction would have been cumulative. *Compare German, supra,* 525 A.2d at 611 (missing witness a police officer). There is, then, at least some reason to believe that Mosley would have testified that Singley only agreed to introduce him to a dealer or that Singley never actually touched the cocaine.

**7.** *Harris v. United States,* 430 A.2d 536, 542 (D.C. 1981); *see also (Raymond) Smith v. United States,* 315 A.2d 163, 168 (D.C.1974) (whether absence of witness has been "satisfactorily explained"), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); *German, supra,* 525 A.2d at 611 ("reasonable, good faith efforts" to locate the witness).

**8.** Singley's contention that the Park Police lacked territorial jurisdiction to make this arrest is meritless, *Richardson v. United States,* 520 A.2d 692, 694–96 (D.C.1987), as is her related contention that the Park Police could not prefer charges against her under the District of Columbia Code. "An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction."

Accordingly, the judgment of conviction of appellants for distribution of cocaine is affirmed, and Singley's conviction for possession of heroin is reversed.

*Affirmed in part and reversed in part.*

NEBEKER, Associate Judge, Retired, dissenting in part:

I would affirm appellant Singley's conviction of possession of heroin. Even if this court might rationally hold that Detective Brown's testimony falls short of proof of usability, I still would decline to direct acquittal under *Edelin v. United States,* 227 A.2d 395 (D.C.1967).

Singley herself testified on cross-examination that the tinfoil packet seized from her contained heroin which she intended to snort. She testified further that it was her ordinary practice to snort heroin and the amount of heroin seized was that which she regularly would be able to snort. I conclude from Singley's unequivocal testimony and reasonable inference of narcotic effect which might be drawn therefrom, that a reasonable juror could, consistent with our holding in *Edelin,* find her guilty beyond a reasonable doubt. Hence, whatever deficiencies there may have been with the chemical analysis of the narcotics or the expert's related testimony, as tested against *Edelin,* such deficiencies were compensated for by the "additional proof" of usability which *Edelin* expressly permits. *See id.* at 399.

Singley's testimony was direct, but not just as to her intent which the majority myopically excises from the rest of her testimony. She also confessed her practice in use and the content of the mixture she possessed for her own use. The jury surely could infer that her "snorting," *i.e.* use, was for its narcotic effect. Why the majority will only settle for expert chemical analysis to prove usability it does not say and I cannot divine. In doing so it runs contrary to the express holding in *Edelin* that other evidence of usability may suffice. I thought this court long since ceased

indulging in fantasies to conjure up an hypothesis of innocence. To say Singley might have snorted talcum powder is, on this record, comical.

I respectfully dissent.

*United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *see also Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).