Sean A. THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–113.

District of Columbia Court of Appeals.

Argued May 18, 1992.
Decided Dec. 30, 1992.

---

Barry Coburn, Washington, DC, for appellant.

Peggy Kuo, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Leslie Ann Wise, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, FARRELL, and SULLIVAN, Associate Judges.

FERREN, Associate Judge:

■ A jury convicted appellant of distributing cocaine. D.C.Code § 33–541(a)(1) (1988 Repl.). Appellant's primary contentions are that: (1) the evidence was insufficient to prove "usable amount"; (2) the trial court erred by failing to instruct the jury properly on "usable amount"; and (3) the prosecutor's misconduct in closing argument denied appellant a fair trial. We conclude that several of the prosecutor's comments and actions during rebuttal argument were unprofessional and, in some instances, clearly improper. But given the strength of the government's case and the trial court's corrective actions, we find no reversible error. We also conclude that some of the government drug expert's testimony was improper because it inappropriately defined for the jury an essential element of the crime of distribution ("usable amount"). Because there was no objection, however, we review for plain error and find none. We therefore affirm.[1]

---

1. Appellant raises two other arguments we deal with summarily. He contends that the trial court abused its discretion (1) in refusing to grant a continuance and (2) in permitting the government to recall a witness.

On the morning of the first day of trial, defense counsel proffered that he had been in another trial the previous five days and requested a continuance to allow more time to talk with some of his witnesses and to talk with appellant about the ramifications of a government plea offer. The government took no position on appellant's request. The trial court observed that it was untimely under Super.Ct.Crim.R. 111(c). The court nonetheless granted the defense a "reasonable pass" until just after noon, when the court heard testimony on a suppression motion. Upon reconvening after lunch, the trial court reconsidered the continuance motion. After determining that defense witnesses were both present and prepared and that appellant had considered the plea offer but had decided to go forward with the trial, the court denied the motion. On this record, we conclude there was no abuse of discretion. See Adams v. United States, 502 A.2d 1011, 1026 (D.C.1986); O'Connor v. United States, 399 A.2d 21, 28 (D.C.1979); Poteat v. United States, 363 A.2d 295, 296 (D.C.1976).

Appellant also claims the trial court abused its discretion when it permitted the government to recall the arresting officer, Officer Dessin, to

## I.

The government's evidence showed a typical corner drug buy and bust. On the evening of October 3, 1989, Officer Rene Dessin, working undercover, was walking down Ninth Street, N.W., when appellant inquired whether he was "looking." The officer replied, "Yes, for twenty," meaning a twenty dollar rock of crack cocaine. Appellant held out two rocks. Officer Dessin selected one and then gave appellant twenty dollars in prerecorded funds. After returning to his car, the officer radioed a lookout description of appellant, and an arrest team moved in and arrested appellant, who had the prerecorded funds, but no cocaine, in his possession. Appellant did not testify but presented a defense of mistaken identification, supported by the testimony of three witnesses.

## II.

■ Appellant contends that the prosecutor's rebuttal argument constituted misconduct requiring reversal. At the beginning of his rebuttal, the prosecutor stated:

Well, the Government submits to you after what you just heard [the defense's closing argument] this place is worse than a waiting room [the trial judge had earlier asked the jurors to conduct themselves appropriately because the courtroom was not a "waiting room"], this place is like one of the restrooms they haven't cleaned out in about a year, after what you just heard in the courtroom today. If you want to send a message, ladies and gentlemen, send a message to this guy right here—

At that point defense counsel objected, and the trial court admonished the prosecutor to "[s]tay away from the defendant in that manner."

The prosecutor continued:

Send a message to him, don't sell drugs; you are guilty of selling drugs. And we told you what the core of this case was, ladies and gentlemen, the core of this case, in less than five minutes an undercover transaction, that transaction took place between Officer Dessin and this young person over there—young person, maybe the Government is giving him too much credit—

When defense counsel raised another objection, the court ordered the prosecutor up to the bench, where the court strongly admonished the prosecutor again. Apparently the prosecutor had approached appellant and had emphasized one of his points by slapping down a piece of paper on the table, because the court warned the prosecutor to control himself, to stay away from appellant, and to refrain from "slap[ping] paper down in front of [the defendant's] face" and "impugn[ing] his character."

The prosecutor then apologized to the jury but a few minutes later argued:

Now the defense has talked about sending a message, send a message, send a message to the Government, send a message to the police that we are not going to stand for this anymore. Well, again, as we talked about earlier, the person we have to send a message to is Mr. Thomas. We are not going to stand for his kind of activities anymore.... The message you send to the community is not let a guilty person go for whatever rea-

explain an incorrect date on the copy of the DEA-7 form (drug lab report) the government sought to introduce into evidence at the close of its case. The date on the copy was September 3, 1989, rather than appellant's arrest date of October 3, 1989. When the government moved to admit the report, defense counsel objected, drawing the prosecutor's attention to the incorrect date for the first time. The prosecutor contended that it was a "typographical error" and the officer should be allowed to return to the stand to explain the discrepancy. After listening to both sides during a bench conference, the trial court allowed the government to recall

Officer Dessin, who explained that he had written a "10" (for October) over top of a preprinted "9" (for September) on the original form, although apparently his handwritten notation had not carried through to the carbon copies below. Our reading of the transcript reveals that the trial court made an "informed choice" based on "a firm factual foundation." *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979). Because the court's action was fully supported by its reasoning, we conclude that the trial court properly exercised its discretion in allowing the government to recall Officer Dessin. *Id.* at 365.

son you did not like the body language of [Officer Dessin].

Defense counsel did not raise any further objections.

Following the government's rebuttal, the trial court began its charge to the jury with a lengthy instruction [2] cautioning the jurors to rely in their deliberations on the evidence in the case and the court's instructions, not on the lawyers' opinions and conduct. Defense counsel did not ask for additional instructions, did not object to the charge as given, and did not move for a mistrial.

We agree with appellant that several of the prosecutor's actions and comments were improper. The prosecutor's unsanitary allegory comparing the courtroom (after appellant's closing argument) to a filthy restroom was at best unprofessional, as were his actions in approaching appellant and slapping down a piece of paper in front of him.[3] Furthermore, this court has repeatedly condemned prosecutorial requests that the jurors "send a message" either to the defendant or to the community. *See Coreas v. United States,* 565 A.2d 594, 604–05 (D.C.1989); *Powell v. United States,* 455 A.2d 405, 410 (D.C. 1982); *Dyson v. United States,* 450 A.2d 432, 438 (D.C.1982); *Reed v. United States,* 403 A.2d 725, 730 (D.C.1979). Although we agree with the government that, seen in context, the prosecutor's exhortations to "send a message" were in response to some of defense counsel's statements dur-

ing closing argument,[4] the prosecutor's rebuttal went well beyond the scope of what was proper.

Rather than responding to defense counsel's attack on the government's actions, evidence, and witnesses, the prosecutor made a general appeal to the jury to take a stand against illegal drug activities. *See Irick v. United States,* 565 A.2d 26, 36 (D.C.1989) ("[T]he key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo."); *Powell,* 455 A.2d at 409 n. 4 (" 'The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law....' " (quoting *ABA Standards for Criminal Justice Relating to the Prosecution Function,* 3–5.8(d))). Such an appeal was clearly improper. As we said in *Powell:* "The function of the jury is to determine the facts based on evidence presented. The jurors are not empaneled to send messages on behalf of their community." 455 A.2d at 410; *accord Coreas,* 565 A.2d at 605.

Our law, however, requires more than a finding of misconduct to warrant a reversal. "If misconduct has occurred, then, viewing the comments in context, we must consider the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the govern-

---

2. The trial court specifically referred to "some instances here in the closing arguments" to which his instructions would be directed.

3. We think the prosecutor's statement, "this young person over there—young person, maybe the Government is giving him too much credit" is too ambiguous, on the cold appellate record, for us to infer that the prosecutor was questioning appellant's humanity, rather than merely calling into question appellant's youth. Furthermore, this court has previously noted that jurors " 'must be credited with enough common sense ... to enable them to evaluate properly conduct and remarks of counsel even when they offend ordinary standards of propriety'." *Smith v. United States,* 315 A.2d 163, 167 (D.C.) (quoting *Hall v. United States,* 84 U.S.App.D.C. 209, 212, 171 F.2d 347, 350 (1948)), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

4. During closing argument defense counsel, in effect, urged jurors to take account of their "function" as "the only buffer" between appellant and "police conduct and Government conduct" that tolerated changing a date on a drug lab report and then trying to get away with it in court. Defense counsel urged the jury "to tell" the police and government that such conduct would not be condoned. The prosecutor did not object. To the extent defense counsel had asked the jury to "send a message" to the police or to the government, the proper course for the prosecutor would have been to object, thereby allowing the trial judge "to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond." *United States v. Young,* 470 U.S. 1, 13, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).

ment's case." *Irick,* 565 A.2d at 32. During the prosecutor's rebuttal, the trial judge took swift and stern corrective action each time defense counsel objected. In addition, he began his instructions to the jury by reminding jurors to decide the case based on their view of the facts, rather than the lawyers' opinions. Although the prosecutor's misconduct in this case was grievous, much of what he said in rebuttal was "the sort of irrelevant rhetoric that the jury likely had the good sense to disregard." *Dyson,* 450 A.2d at 438.

In light of the trial court's corrective actions and the government's strong evidence of appellant's guilt (including the recovery of the prerecorded funds from his possession), we conclude that "we can say with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole that the judgment was not substantially swayed" by the prosecutor's actions and comments. *Mathis v. United States,* 513 A.2d 1344, 1348 (D.C.1986) (quotations omitted); *see Dyson,* 450 A.2d at 439; *Reed,* 403 A.2d at 731. The prosecutor's misconduct was not prejudicial enough to warrant reversal.

## III.

To prove appellant distributed cocaine in violation of D.C.Code § 33–541(a)(1), the government, in accordance with its theory in this case, was required to prove that appellant had sold a "usable" quantity of drugs to Officer Dessin. *Edelin v. United States,* 227 A.2d 395, 398–99 (D.C.1967). To meet its evidentiary burden, the government had to demonstrate that the substance appellant sold "was marketable and of sufficient quality to be of some utility to a user." *Gray v. United States,* 600 A.2d 367, 369 (D.C.1991). This burden is not onerous: " '[T]he fact that a drug is measurable—*i.e.,* capable of quantitative analysis—will usually suffice to prove it is usable.' " *Judge v. United States,* 599 A.2d 417, 419–20 (D.C.1991) (quoting *Wishop v.*

United States, 531 A.2d 1005, 1008 (D.C. 1987)).

■ In previous cases, this court has found the government's case sufficient, with respect to its burden of proving usable amount, when the government has introduced the following evidence: (1) the total weight of the substance the defendant distributed, (2) the percentage of the total weight consisting of the active drug ingredient, and (3) expert testimony that, based on the total weight and the percentage of active ingredient, the defendant distributed a usable amount. *See, e.g., Judge,* 599 A.2d at 419–20; *Davis v. United States,* 590 A.2d 1036, 1038 (D.C.1991).[5] Such evidence is required only to ensure that the defendant distributed more than a "trace amount." "[A] trace amount is insufficient to convict whenever it cannot produce a narcotic effect in any form." *Singley v. United States,* 533 A.2d 245, 248 (D.C. 1987). Thus, in general, only if the quantity of the illegal drug is too small to be analyzed quantitatively must the government provide "additional proof of its usability as a narcotic." *Wishop,* 531 A.2d at 1008 (quoting *Edelin,* 227 A.2d at 399).[6]

The government's expert, Detective Brenner, stated that the drug lab report indicated "that the evidence submitted was tested and found to be cocaine base that had a strength of ninety-three percent." Detective Brenner, however, never told the jury the weight of the substance analyzed, a critical element of the proof the government was relying on. The strength of the cocaine (93 percent) has no meaning without reference to the overall weight. For example, 93 percent of one milligram of cocaine base is likely to be a trace amount, while 93 percent of 200 milligrams surely would be a usable amount. *Compare Singley,* 533 A.2d at 247–48 (trace amount) *with Judge,* 599 A.2d at 419–20 (usable amount). Without evidence of the total weight of the substance analyzed, a reason-

---

**5.** As indicated in *Washington v. United States,* 619 A.2d 30 (D.C.1992), expert testimony will not always be required to prove usable amount.

**6.** Such additional proof may include circumstantial evidence that the drugs were offered for

sale in quantities and packaging consistent with distribution. *Bernard v. United States,* 575 A.2d 1191, 1194–95 (D.C.1990).

able juror would be left scratching his or her head asking, "Ninety-three percent of what?"

We hasten to add that in this case the government also introduced in evidence the drug lab report, which listed the total weight of the substance analyzed: 160 milligrams.[7] Thus, the jury had the necessary information it needed, assuming it put together the expert's testimony with the information on the lab report. Of course, the lab report itself provides the ninety-three percent strength figure, so the only additional evidence the expert provided was his opinion that it was a usable amount, rendered after examining the strength of the active ingredient (cocaine) measured in reference to the substance's overall weight.

■ In response to the prosecutor's direct examination during the government's case-in-chief, the expert opined that the lab report indicated a usable amount based on his own definition: "A usable amount is any amount that can be taken into the system in the usual way that a drug is used." Appellant argues—and we agree—that a government expert witness is not the appropriate person to provide the jury with the definition of "usable amount," a legal term that signifies an essential element of the crime of distribution. The definition of "usable amount" has been established by a series of opinions by this court, not by expert testimony. *See, e.g., Edelin; Harris v. United States*, 489 A.2d 464, 470 (D.C.1985); *Hawkins v. United*

*States*, 482 A.2d 1230, 1233 (D.C.1984); *Wishop; Singley; Davis; Judge; Gray.* Just as a government expert should not provide the jury with a definition of "premeditation" or "malice" under our murder statutes, neither should a government expert supply the definition of "usable amount" under our drug distribution statute. Only the trial judge may properly give the jury such a legal definition in an instruction.

■ This is not to say that the prosecutor may not appropriately frame questions leading to an expert opinion that a drug lab report (or any other evidence) indicates a particular substance is a "usable amount" of a controlled substance, consistent with the law and the trial court's eventual instruction. Nor do we hold that testimony by a police expert that the substance in question was of sufficient quantity to be ingested into the body in the usual way drugs are taken has no probative value as evidence of usability as a narcotic. *See Gray*, 600 A.2d at 369. But the expert cannot, as in this case, provide his or her own legal definition of usable amount for the jury, especially one that excludes material parts of the definition established by our cases.[8]

In *Gray*, the appellant claimed that the government expert "erroneously defined 'usable amount,'" 600 A.2d at 368, when the expert provided a definition similar to the one provided by the expert here: "A

7. Defense counsel objected when Detective Brenner began to read from the drug lab report, requesting that the expert "just say it appears to be a usable amount." Defense counsel's request may have stopped short the detective's reading of the vital information on the report for the jury.

8. The government argues that the expert's definition of usable amount "was entirely in accord with the law." We disagree. Detective Brenner's definition, "A usable amount is *any amount* that can be taken into the system in the usual way that a drug is used," says nothing about the required quantity of the substance (more than a trace amount) or whether the substance distributed in fact contained an illegal drug. *See Bernard*, 575 A.2d at 1193.

Experts may "testify as to opinions or conclusions." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT

OF COLUMBIA, No. 1.05 (3d ed. 1978). Although experts frequently define terms relevant to the jury's understanding of their conclusions, experts do not define essential elements of the crime charged. For example, during voir dire to qualify as an expert, Detective Brenner appropriately testified that he was familiar with the term "usable amount" from his training and "working in the field." Based on his demonstrated experience and knowledge, Detective Brenner qualified as an expert. Although Detective Brenner was then able to testify as to whether the evidence in this case indicated a usable amount (e.g., because of the weight and percentage of active ingredient listed on the drug lab report), he should not have been allowed to define for the jury what "usable amount" means. That, ultimately, is the trial court's responsibility.

usable amount is any amount of the drug that can be ingested into the system through its normal use. For an example, cocaine, any amount of cocaine that can be absorbed or taken into the body is a usable amount of that drug." *Id.* at 369. After describing the expert's definition as "perhaps not as precise or thorough as one might desire," *id.*, we affirmed the appellant's conviction because "[t]here was extensive evidence that the cocaine at issue in [the] case was marketable and of sufficient quantity to be of some utility to a user." *Id.* We added that we believed the expert's "definition was intended not as a legal definition of the term 'usable amount' but rather as a way of distinguishing, on a factual level, the amount of cocaine seized in this case from a trace amount or from residue on drug paraphernalia." *Id. Gray* therefore does not hold that an expert may offer a legal definition of usable amount inconsistent with the standard established by our decisions.

▇▇▇▇ It is interesting to note that, apparently, trial courts routinely have not been defining "usable amount" because the standard jury instructions for "simple possession," for "possession with intent to distribute," and for "distributing a controlled substance"—which require the jury to find "some measurable amount"—do not define that term or "usable amount." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA. Nos. 4.31–4.33.[9] This "Redbook" of jury instructions, however, is not the law; it is only a resource for jury instructions. If a defendant had wanted an instruction defining "usable amount," then counsel and the court could have gleaned a definition from our numerous cases on the term's meaning. But defense counsel typically have not been insisting on such an instruction. Rather, this court has been sorting out the issue on appeal by looking at whether the evidence of record, including expert testimony, has met the legal test

when neither expert nor jury has been instructed as to what it is. *See, e.g., Gray.* The better practice, therefore, is for counsel and the court to use such an instruction which, by way of example, we set forth as follows, based on our case law:

A "usable amount" of a controlled substance is an amount that is marketable and thus of sufficient quality to be of some use to a user.

Evidence that the amount of the controlled substance is capable of being analyzed and measured, as indicated by a report of its weight, will usually be enough to prove it is usable.

If the controlled substance is a mixture or compound, the evidence will usually be enough to prove usable amount if the percentage of overall weight attributable to the active drug ingredient is capable of being analyzed and measured.

If the active ingredient is too small to be measured, or if for any other reason it cannot be measured, or if the government has not presented proof that the drug has been measured, then to prove usable amount, the government must provide other proof of the substance's use to a user.[10]

▇▇▇ In this case, as has been typical, defense counsel did not raise any objection to the expert's opinion that the lab report indicated a usable amount. Although we conclude that it was improper for the government's expert to define usable amount for the jury, the expert's definition in this case did not negate the otherwise proper and sufficient evidence the government presented on usable amount: the lab report showing the total weight of the substance the defendant distributed and the percentage of the total weight consisting of the active drug ingredient, coupled with the expert opinion that the defendant distributed a usable amount. *See, e.g., Judge,* 599 A.2d at 419–20; *Davis,* 590 A.2d at 1038. We therefore discern no reversible error.

9. In *Wishop,* we said "the fact that a drug is measurable tends to show that it is also usable[; ...] the fact that a drug is measurable—*i.e.,* capable of quantitative analysis—will usually suffice to prove that it is usable." 531 A.2d at 1008.

10. In the circumstances of this case, we need not go further in instruction-drafting and explain what this other proof may be. *But see supra* note 6.

## IV.

Finally, in a related claim, appellant challenges the trial court's instruction to the jury on "usable amount." Because appellant did not object to the instruction or offer an alternative, we review for plain error. *Wishop*, 531 A.2d at 1007. The trial judge explained to the jury that the government had the burden "to show beyond a reasonable doubt that there was a usable amount of cocaine distributed," but, as noted above, the judge did not define the term for the jury. Our previous decisions, however, have required no more when the defense failed to object or offer an alternative instruction. *See, e.g., Wishop*, 531 A.2d at 1008 (instruction on usability must be sufficient to inform jury of elements of the crime and the government's burden of proof). We, therefore, find no plain error with respect to the instruction given.

Accordingly, the judgment below is hereby

*Affirmed.*

SULLIVAN, Associate Judge, concurring in part and dissenting in part:

I join in the court's opinion affirming appellant's conviction for distribution of cocaine. Where I part company with the majority, however, is with regard to its holding that "a government expert witness is not the appropriate person to provide the jury with the definition of 'usable amount.'" *Ante* at 26. In my opinion, this holding conflicts with this court's holding in *Gray v. United States*, 600 A.2d 367, 369 (D.C.1991), wherein we approved a virtually identical definition of usable amount, offered by a government expert witness, in a virtually identical factual context. Thus, because no division of this court can overrule a prior decision of this court, *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), I respectfully dissent.

Judge FERREN, writing for the majority, states that the government's "expert cannot, as in this case, provide his or her own legal definition of usable amount for the jury, especially one that excludes material parts of the definition established by our cases." *Ante* at 26 (footnote omitted).

In *Gray*, however, which upheld the *government* expert's virtually *identical* definition of usable amount, Judge FERREN, writing for the majority, "conclude[d] that [the expert's] definition, while perhaps not as precise or thorough as one might desire, was adequate on this record to support his expert opinion that the cocaine seized was a usable amount." *Id.* at 369.

In *Gray*, in response to a question— "What is a usable amount?"—*id.* at 368, the expert stated that: "[a] usable amount is any amount of the drug that can be ingested into the system through its normal use." *Id.* at 369. That definition, considered with the expert's additional testimony regarding the manner in which the drugs were packaged and marketed on the street, the testimony that the drugs seized were consistent with "dime cocaine" (bags sold for $10.00 each), and the fact that the drugs were analyzed to contain .278 grams of cocaine, persuaded the *Gray* court to conclude that the definition was adequate "to support [the] expert['s] opinion that the cocaine seized was a usable amount." *Id.* at 369.

In the present case, the government expert was qualified without objection as an expert "in the use of illegal narcotics, the sale of narcotics, the way the police department[s] safeguard [ ] narcotics, and also *what a usable amount of narcotics [is]*." (Emphasis added). In response to a question—"[C]ould you please, . . . give a definition to the jury of usable amount of narcotics?"—the government's expert testified that "[a] usable amount is any amount that can be taken into the system in the usual way that a drug is used. . . ." *Ante* at 26. Having provided a factual predicate for an opinion, the expert then opined that the seized cocaine, which had been analyzed as 93 percent pure cocaine and found to weigh 200 milligrams, was a usable amount.

The expert in the present case testified in precisely the same manner as the expert in *Gray;* i.e., he provided the jury with an adequate definition and factual basis to support his expert opinion that the cocaine

seized was a usable amount. In other words, having been qualified as an expert on the use of illegal drugs and what constitutes a usable amount, it was clearly appropriate for the expert to explain to the jury his understanding of the term usable amount, in order to place in context for the jury his ultimate conclusion that the cocaine distributed in this case was a usable amount. Thus, the majority should not decide this issue inconsistently with our decision in *Gray*.

The majority states, without any explication, that the expert in the present case provided his own "legal definition of usable amount." *Ante* at 26. The majority then attempts to reconcile its holding with *Gray* by stating that the *Gray* court affirmed the appellant's conviction because "the expert's 'definition was intended not as a legal definition of the term "usable amount" but rather as a way of distinguishing, on a factual level, the amount of cocaine seized in this case from a trace amount or from residue on drug paraphernalia.'" *Ante* at 27 (quoting *Gray, supra,* 600 A.2d at 369). My colleagues, however, point to nothing in the record that remotely suggests that the expert in the present case, like the expert in *Gray*, offered a definition of usable amount for *any* purpose other than to support his expert definition that the cocaine seized was a usable amount.

Accordingly, in view of the foregoing and our decisions in *Gray v. United States, supra,* 600 A.2d at 369, and *M.A.P. v. Ryan, supra,* 285 A.2d at 312, I respectfully dissent from that portion of the majority's holding that a government expert witness is not the appropriate person to provide the jury with a definition of usable amount.

My last concern is best raised in the form of a rhetorical question. The majority opinion conflicts with *Gray, supra,* although in both cases the court was confronted with identical testimony offered by a government expert witness in a context that was factually and procedurally identical. With this conflict in our opinions, how will lawyers, trial judges, or, indeed, future divisions of this court be able to determine in similar cases that a government expert's definition of usable amount is offered as a legal definition and not merely as factual support for the expert's opinion?

In considering our numerous published opinions which address, in one way or another, proof of usable amount,[1] and our decisions today in the present case and in *Washington v. United States,* 619 A.2d 20 (D.C.1992), maybe the time has come for the en banc court to address the issue of whether the government should continue to bear the burden of establishing the judicially-created usable amount requirement in narcotics prosecutions in the District of Columbia.[2] It appears that the District of

---

1. *Johnson v. United States,* 611 A.2d 41 (D.C. 1992); *Gray v. United States,* 600 A.2d 367 (D.C. 1991); *Judge v. United States,* 599 A.2d 417 (D.C. 1991); *Davis v. United States,* 590 A.2d 1036 (D.C.1991); *Bernard v. United States,* 575 A.2d 1191 (D.C.1990); *Seeney v. United States,* 563 A.2d 1081 (D.C.1989), *cert. denied,* 498 U.S. 858, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990); *Singley v. United States,* 533 A.2d 245 (D.C.1987); *Wishop v. United States,* 531 A.2d 1005 (D.C.1987); *Craig v. United States,* 490 A.2d 1173 (D.C.1985); *Harris v. United States,* 489 A.2d 464 (D.C.1985); *Hawkins v. United States,* 482 A.2d 1230 (D.C. 1984); *Beach v. United States,* 466 A.2d 862 (D.C.1983); *Blakeney v. United States,* 366 A.2d 447 (D.C.1976); *Thomas v. United States,* 352 A.2d 390 (D.C.1976); *Jones v. United States,* 318 A.2d 888 (D.C.1974); *Edelin v. United States,* 227 A.2d 395 (D.C.1967).

2. Thirty-one states have rejected the usable amount requirement in narcotics prosecutions.

*Allen v. State,* 382 So.2d 1147 (Ala.Crim.App.), *cert. denied,* 382 So.2d 1158 (1980); *Moreau v. State,* 588 P.2d 275 (Alaska 1978); *Fagin v. People,* 484 P.2d 1216 (Colo.1971); *State v. McCarthy,* 25 Conn.App. 624, 595 A.2d 941 (App.Ct.), *appeal denied,* 598 A.2d 366 (1991); *State v. Eckroth,* 238 So.2d 75 (Fla.1970); *Scott v. State,* 170 Ga.App. 409, 317 S.E.2d 282, *aff'd,* 253 Ga. 147, 317 S.E.2d 830 (1984); *State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979); *People v. McNeely,* 99 Ill.App.3d 1021, 55 Ill.Dec. 321, 426 N.E.2d 296 (1981); *Schwartz v. State,* 177 Ind.App. 258, 379 N.E.2d 480 (1978); *State v. Brown,* 245 Kan. 604, 783 P.2d 1278 (1989); *Commonwealth v. Shivley,* 814 S.W.2d 572 (Ky.1991); *State v. McGowan,* 541 A.2d 1301 (Me.1988); *Frasher v. State,* 8 Md.App. 439, 260 A.2d 656, *cert. denied,* 400 U.S. 959, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970); *People v. Hunten,* 115 Mich.App. 167, 320 N.W.2d 68 (1982); *State v. Siirila,* 292 Minn. 11, 193 N.W.2d 467 (1971), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2503, 33 L.Ed.2d 336 (1972);

Columbia is one of only three jurisdictions that even requires proof of a usable amount in the prosecution of narcotics cases.[3]

*Hampton v. State,* 498 So.2d 384 (Miss.1986); *State v. Willers,* 794 S.W.2d 315 (Mo.Ct.App. 1990); *State v. Brown,* 195 Neb. 321, 237 N.W.2d 861 (1976); *Sheriff, Clark County v. Benson,* 89 Nev. 160, 509 P.2d 554 (1973); *State v. Pike,* 134 N.H. 690, 597 A.2d 1071 (1991); *State v. Humphreys,* 54 N.J. 406, 255 A.2d 273 (1969); *State v. Grijalva,* 85 N.M. 127, 509 P.2d 894 (Ct.App.1973); *People v. Mizell,* 72 N.Y.2d 651, 536 N.Y.S.2d 21, 532 N.E.2d 1249 (1988); *State v. Thomas,* 20 N.C.App. 255, 201 S.E.2d 201 (1973), *cert. denied,* 284 N.C. 622, 202 S.E.2d 277 (1974); *State v. Daniels,* 26 Ohio App.3d 101, 498 N.E.2d 227 (1985); *Spriggs v. State,* 511 P.2d 1139 (Okla.Crim.App.1973); *State v. Forrester,* 29 Or.App. 409, 564 P.2d 289 (1977); *State v. Warner,* 788 P.2d 1041 (Utah Ct.App.1990); *Robbs v. Commonwealth,* 211 Va. 153, 176 S.E.2d 429 (1970); *State v. Williams,* 62 Wash. App. 748, 815 P.2d 825 (1991), *review denied,* 118 Wash.2d 1019, 827 P.2d 1012 (1992); *State v. Dodd,* 28 Wis.2d 643, 137 N.W.2d 465 (1965), *overruled on other grounds by State v. Woods,* 117 Wis.2d 701, 345 N.W.2d 457 (1984).

**3.** The other jurisdictions are Arkansas (*Harbison v. State,* 302 Ark. 315, 790 S.W.2d 146 (1990) and Arizona (*State v. Moreno,* 92 Ariz. 116, 374 P.2d 872 (1962) (en banc)).