Sean A. THOMAS, Appellant,

Alonzo D. Washington, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–113, 91–CF–818.

District of Columbia Court of Appeals.

Argued En Banc Sept. 23, 1993.
Decided Nov. 9, 1994.

† Judge Wagner was an Associate Judge of this
court at the time of argument. Her status
changed to Chief Judge on June 14, 1994.

* Associate Judge Farrell has recused himself from
these cases.

184

Barry Coburn, Washington, DC, filed a brief for appellant in 91–CF–113.

Deborah Persico, McLean, VA, filed a brief for appellant in 91–CF–818.

David Reiser, Public Defender Service, with whom Jo–Ann Wallace, Lisa Greenman, Eduardo Juarez, and James Klein, Public Defender Service, Washington, DC, were on brief, for appellants and Public Defender Service as amicus curiae.

Roy W. McLeese, III, Asst. U.S. Atty., with whom Eric J. Holder, Jr., U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, DC, were on the brief, for appellee.

Before WAGNER, Chief Judge,* FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, KING, and SULLIVAN, Associate Judges, and BELSON, Senior Judge.

## ON REHEARING EN BANC

KING, Associate Judge:

■ On December 30, 1992, two divisions of this court, in unrelated cases, affirmed the convictions of Sean A. Thomas and Alonzo D. Washington for controlled substance violations, rejecting claims that the evidence presented did not constitute a "usable amount" of the controlled substance in question. *Thomas v. United States,* 619 A.2d 20 (D.C. 1992), and *Washington v. United States,* 619 A.2d 30 (D.C.1992) (per curiam). In *Thomas,* Judge Sullivan, in a separate opinion, suggested that the *en banc* court address the question of whether this court should continue to apply the usable amount standard. Thereafter, the court granted the government's motion for rehearing *en banc* in both cases to reexamine the validity of the usable amount requirement in prosecutions for violations of laws related to controlled substances.[1] *See Edelin v. United States,* 227 A.2d 395 (D.C.1967). We hold that, in order to secure a conviction for controlled substance violations, the government need only prove there was a measurable amount of the controlled substance in question. The usable amount standard will no longer apply to prosecutions under the Controlled Substances Act for offenses committed after the date of this opinion.[2]

---

* Former *Chief Judge* Rogers was a member of the en banc court that heard oral argument in this case, but resigned from this court on March 18, 1994. On June 14, 1994, *Associate Judge* Annice M. Wagner assumed the position of *Chief Judge.*

1. *Thomas* and *Washington v. United States,* 635 A.2d 902 (1993) (order granting petitions for rehearing en banc and vacating the opinions and judgments of December 30, 1992). At the court's request, the Public Defender Service ("PDS") appeared as *amicus curiae.* It filed a comprehensive brief and conducted oral argument on behalf of both appellants. The court appreciates the contribution of David Reiser and other members of PDS who may have provided assistance.

2. *Amicus curiae* contends the order granting the government's petition for rehearing *en banc* should be vacated as improvidently granted. *Amicus* maintains that additional appellate review may not be granted in favor of a party prevailing on appeal and that the issue of usable amount is not properly before the court. We disagree.

There is nothing in D.C.App.R. 40, the provision authorizing petitions for rehearing or rehearing *en banc,* that precludes any party from seeking further appellate review. In addition, pursuant to D.C.App.R. 40(e), a majority of the active judges of the court may *sua sponte* order rehearing or rehearing *en banc* either when "consideration by the full court is necessary to secure or maintain uniformity of its decisions" or "when the proceeding involves a question of exceptional importance." Thus, while it may be the rare case that the prevailing party is granted rehearing *en banc,* there is no rule of this court prohibiting that course. Moreover, *amicus* cites no cases, nor have we found any, holding that a request for rehearing *en banc* should not be

# I.

## A. No. 91–CF–113, Thomas v. United States

On October 3, 1989, Thomas approached an undercover police officer and, after a brief conversation, sold the officer one rock of crack cocaine for twenty dollars. The rock purchased by the undercover officer was determined by chemical analysis to weigh 160 milligrams, 93% of which was cocaine.

Thomas was convicted of distribution of cocaine,[3] and on appeal he principally contended there was insufficient evidence to prove there was a usable amount of cocaine and that the trial court erred in failing to instruct the jury on the definition of usable amount.

The division, concluding that a laboratory report indicating the quantity of cocaine in the rock sold, together with expert testimony by a police officer concerning the significance of the results contained in the report, provided the "necessary information" for the jury, held that it was not reversible error for the expert witness to define the term usable amount for the jury. *Thomas, supra,* 619 A.2d at 25–27. The division held that the trial court did not commit plain error by failing to define usable amount, *id.* at 28; however, the court promulgated a suggested jury instruction providing such a definition. *Id.* at 27.

## B. No. 91–CF–818, Washington v. United States

On November 26, 1990, two undercover patrol officers arrived at the 300 block of L Street, S.W., after being informed that someone in that vicinity was "working," *i.e.,* selling drugs. One of the officers then walked to a nearby fence, where Washington had been observed handling blue ziplock bags, and recovered a white bag that contained fourteen blue ziplock bags, all of which held rock-like substances. An expert witness for the government testified that the fourteen bags contained a total of 7.233 grams of cocaine of 92% purity.

Washington was convicted of possession with intent to distribute cocaine,[4] and he contended on appeal that there was insufficient evidence to support the conviction because the government failed to establish through expert testimony that he possessed a usable amount of cocaine.

The division disagreed, holding that expert testimony was not essential to establish usable amount, and concluded that "the government established usability in a variety of ways," including evidence of the quantity of drugs recovered, the packaging of the drugs, as well as observation of Washington selling, to an unidentified citizen, a ziplock bag that he had obtained from the same white bag recovered by the officers. *Washington, supra,* 619 A.2d at 32–33.

# II.

In its initial brief in No. 91–CF–818, the government contended that the applicable statute prohibits the possession of a controlled substance with intent to distribute, without regard to the quantity of the substance involved. Moreover, it maintained that "proof of usable amount is not required to support a conviction under D.C.Code § 33–541." The latter argument was premised upon four separate criticisms of the usable amount requirement as being: (1) inconsistent with the plain language and legislative history of the relevant statutes, (2) contrary to the overwhelming weight of state and federal authority, (3) difficult to apply, thereby, generating needless litigation, and (4) contrary to the legislative policy of complete suppression of unauthorized possession of controlled substances. These arguments were all new in the sense that they were made for the first time in this court, so far as we can determine, in May 1992, when the government filed its initial brief in No. 91–CF–818. Thus, the arguments were first presented eleven years, and scores of appeals involving the issue, after the applicable statute, the District of Columbia Uniform Con-

---

granted to the party initially prevailing in the appeal.

**3.** D.C.Code § 33–541(a)(1) (1993).

**4.** D.C.Code § 33–541(a)(1) (1993).

trolled Substances Act of 1981 ("DC–CSA"),[5] was enacted into law by the Council of the District of Columbia ("Council").

The prohibition applicable to these cases makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or possess with intent to manufacture or distribute, a controlled substance." D.C.Code § 33–541(a)(1). Appellant Thomas was charged with distribution, while appellant Washington was charged with possession with intent to distribute a controlled substance. The government contends that *any* amount of a controlled substance is a violation of this statutory provision, an interpretation which, it asserts, is plain from the law's terms. We find it puzzling, if the meaning is as clear and as obvious as the government contends it to be, that it has taken this long for this argument to be presented to us. This belated discovery of the statute's meaning, however, does not estop the government from making the argument because, if we conclude that the Council's intent was as is contended by the government, we are obligated to apply that intent. What *is* plain to us is that the terms in the statute are not as crystal clear in their meaning as they are to the government. One may question, for example, whether a substance can even be identified as a "controlled substance," as defined by the statute, if it is so minute as to escape all measurement. In short, it is not obvious, in our view, that the Council in adopting the DC–CSA, without doubt, intended that any amount of a controlled substance would be sufficient to support a conviction.

Since the meaning is not plain, we will resort, as we ordinarily must, to interpretative techniques that courts find helpful in determining the intent of the legislature. We have identified two applicable principles that appear, at least on the surface, to produce conflicting results. The two interpretative approaches both involve presumptions concerning the meaning of words or terms in a new statute when the same words or terms appear in an already existing statute and have a reasonably settled and understood meaning. One presumption, urged upon us by the government, holds that · when the Council enacts, in substance, some existing federal statute, it does so, absent an indication to the contrary, together with any known and settled interpretations of the provisions of that statute by the highest court or courts called upon to interpret it. *McReady v. Department of Consumer & Reg. Affairs*, 618 A.2d 609, 615 (D.C.1992) (citation omitted). Similarly, when a legislative body uses words or terms that have appeared in other legislation enacted by the same legislative body, or as in this case a predecessor legislative body,[6] then it is presumed, absent a contrary indication, that the words or terms incorporated into the new statute will have the same meaning as those words or terms had in the existing statute. *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law").[7] *Amicus* argues that we should apply this presumption.

5.  D.C.Law 4–29, §§ 102–703, 28 D.C.Reg. 3081 (1981) (codified as amended in D.C.Code §§ 33–501 to –703 (1993)).

6.  As discussed *infra*, the Congress of the United States enacted the statute interpreted in *Edelin*. Congress subsequently authorized the Council to enact laws relating to criminal offenses in the District of Columbia after passage of "the twenty-four full calendar months immediately following the day on which the members of the Council first elected pursuant to this Act take office." Title VI, § 602(a)(9) of the District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, § 602, 87 Stat. 813 (1973) (codified in D.C.Code § 1–147(a)(9) (1976

Supp.)). The limitation period set forth above was later extended to forty-eight months. *See* Pub.L. No. 94–402, 90 Stat. 1220 (1976) (codified in D.C.Code § 1–233(a)(9) (1992)); *see also McIntosh v. Washington*, 395 A.2d 744, 750 n. 12 (D.C.1978).

7.  *Accord United States v. Dixon*, 347 U.S. 381, 384–85, 74 S.Ct. 566, 568, 98 L.Ed. 785 (1954); *In re Estate of Posey*, 89 N.J.Super. 293, 214 A.2d 713, 718 (Union County Ct.1965) ("When words in a statute have previously received judicial construction, the legislature will be deemed to be using them in the sense that has been ascribed to them"), *aff'd*, 92 N.J.Super. 259, 223 A.2d 38 (App.Div.1966).

## III.

Before applying these interpretative aids, however, we think it helpful to provide some background regarding the statutes involved in this inquiry. The usable amount requirement was imposed by this court in 1967 in *Edelin, supra,* 227 A.2d at 399. The provision interpreted in *Edelin* was part of the Uniform Narcotic Drug Act ("UNA"), which was enacted by Congress in 1938.[8] It provided that "[i]t shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any narcotic drug[9] . . . ." D.C.Code § 33–402(a) (1961). The offenses created by the UNA were misdemeanors, punishable by a term of incarceration of up to one year. Although the UNA contains prohibitions of a variety of acts, *e.g.,* the statute makes it unlawful to manufacture, sell, administer, etc., possession of a narcotic drug was the only charge that arose in our reported cases.

At the time *Edelin* was decided, misdemeanor narcotic possession cases, involving small quantities, were prosecuted in the Court of General Sessions (the predecessor court to the Superior Court)[10] and felony drug charges, which involved either larger amounts or actual sales, were prosecuted in the United States District Court, principally pursuant to the Harrison Narcotics Act[11] and the Jones–Miller Act.[12] *See Palmore v. United States,* 411 U.S. 389, 392 n. 2, 93 S.Ct. 1670, 1673 n. 2, 36 L.Ed.2d 342 (1973) (discussing prosecutions of criminal cases in the District of Columbia). Both of these statutes were repealed in 1970 when Congress enacted the federal Controlled Substances Act ("US–CSA").[13]

After enactment of the US–CSA, felony drug prosecutions continued to take place in the Federal District Court and misdemeanor possession charges continued to be prosecuted in the Court of General Sessions and, after court reorganization, in the Superior Court.[14] During the first decade of its existence, no felony drug prosecutions took place in the Superior Court. In 1981, however, the Council enacted DC–CSA, which is virtually identical in nearly every respect to the US–CSA. The prohibition provision applicable to these cases is, for all practical purposes, the same in the two statutes. The US–CSA provides:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance. . . .

21 U.S.C. § 841(a)(1). The District provision varies only slightly:

> Except as authorized by this chapter, it is unlawful for any person knowingly or intentionally to manufacture, distribute, or

---

**8.** The Uniform Narcotic Drug Act was adopted by the National Conference of Commissioners on Uniform State Laws in 1932. 9B UNIFORM LAWS ANNOTATED 7 (Master Ed.1987). As noted, the UNA was enacted by Congress and made applicable to the District of Columbia in 1938. All but three of the states eventually adopted the UNA. *Id.* at 8–10. Only California, Maine, and Pennsylvania did not; however, the latter two adopted similar provisions. *Id.* Beginning in 1970, all jurisdictions that had adopted the UNA repealed that provision and substituted the Uniform Controlled Substance Act. *Id.; see* note 29, *infra.*

**9.** The statute further provided:

"Narcotic drugs" means coca leaves, opium, cannabis, isonipecaine, and opiate, and every substance not chemically distinguishable from them, and any compound, manufacture, salt, derivative, or preparation of coca leaves, opium, cannabis, isonipecaine, or opiate, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis.

D.C.Code § 33–401(n) (1961).

**10.** *See* D.C.Code § 11–901 (1989).

**11.** Formerly codified in 26 U.S.C. § 4701 *et seq.* (1964).

**12.** Also referred to as the Narcotic Drugs Import and Export Act, it was formerly codified in 21 U.S.C. § 171 *et seq.* (1964).

**13.** Pub.L. No. 91–513, Title II, §§ 101–1200, 84 Stat. 1242 (1970) (codified as amended in 21 U.S.C. §§ 801–971 (1988 & Supp. V 1993)).

**14.** *See* D.C.Code §§ 11–901, –923 (1989 and 1994 Supp.).

possess, with intent to manufacture or distribute, a controlled substance.

D.C.Code § 33–541(a)(1).

When the Council enacted the DC–CSA it repealed the Uniform Narcotics Act. As we shall see later in this opinion, judicial interpretations of the UNA and of the US–CSA have generally reached different results concerning the quantity of a controlled substance necessary to sustain a conviction. The UNA, beginning with *Edelin*, requires a showing of a "usable" amount of the substance in question. Under the US–CSA, however, the prosecutor generally must prove, at most, a "measurable" amount of the controlled substance. We must determine which of these formulations, if either, the Council intended would apply to prosecutions conducted pursuant to the DC–CSA. As we have said, the plain terms of the statutes do not provide the answer, and there is nothing in their legislative history that directly enlightens on that point. We will now examine the evolution of each of these standards to determine whether there are any clues to assist us in our determination of their meaning.

## IV.

As we have said, the usable amount requirement was first imposed in 1967 in *Edelin*, *supra*, which involved a prosecution under the UNA for possession of heroin. Edelin was linked to narcotic paraphernalia that, after chemical analysis, were found to contain microscopic traces of heroin. He argued in this court that the quantity of heroin was insignificant and that he should be convicted only if the amount of the narcotic drug in question could be used for "the purposes for which narcotic drugs are used."[15] The government argued, however, that no such showing was required, contending instead that the statute in question barred possession of "all quantities of heroin without exception" and that small quantities were not exempt from the law's coverage.[16] We rejected the government's contention, and, adopting the rationale of *State v. Moreno*, 92 Ariz. 116, 374 P.2d 872 (Ariz.1962) (*en banc*), held that there can be no conviction "where there is only a trace of a substance ..., and there is no additional proof of its usability." *Edelin*, *supra*, 227 A.2d at 399. The *Edelin* court defined a trace as "a chemical constituent not quantitatively determined because of minuteness." *Id.* The court also found support for its conclusion in the fact that only four other jurisdictions had decided the issue and three had opted for the usable amount requirement.[17] *Id.* at 398.

Thus was born the usable amount requirement in narcotics possession prosecutions in the District of Columbia. Less than two months later, in another heroin possession case involving a minute quantity, we held that the "absence of any proof ... that appellants had in their possession more than a trace of heroin or that such trace could be used or dispensed as a narcotic" required reversal. *Marshall v. United States*, 229 A.2d 449, 450 (D.C.1967) (per curiam). Over the next dozen years, in our reported cases, we applied the usable amount requirement in five[18] other cases involving possession of narcotics prosecuted under the UNA.

As noted earlier, the Council enacted the DC–CSA in 1981. Thereafter, the number of felony drug trafficking indictments in Superior Court increased from none in 1981 to over

**15.** *Edelin v. United States*, appellant's Br. at 8.

**16.** *Edelin v. United States*, government's Br. at 3.

**17.** *See Moreno*, *supra* (which applied some form of a usable amount requirement); *People v. Leal*, 64 Cal.2d 504, 50 Cal.Rptr. 777, 413 P.2d 665 (1966) (*en banc*); *Greer v. State*, 163 Tex.Crim. 377, 292 S.W.2d 122 (1956). Only Wisconsin held otherwise. *See State v. Dodd*, 28 Wis.2d 643, 137 N.W.2d 465 (1965). At the time these cases were decided the UNA, with a provision essentially identical to the District of Columbia's provision, was in force in Arizona, Texas, and Wisconsin. The UNA was never adopted by California; however, its statute provided for "heavy penalties for 'every person who possesses any narcotic other than marijuana except upon the written prescription....'" *Leal*, *supra*, 50 Cal. Rptr. at 778, 413 P.2d at 666 (quoting Cal. Health & Safety Code § 11500).

**18.** See *Payne v. United States*, 294 A.2d 501 (D.C. 1972); *Jones v. United States*, 318 A.2d 888 (D.C. 1974); *Richardson v. United States*, 366 A.2d 433 (D.C.1976); *Blakeney v. United States*, 366 A.2d 447 (D.C.1976); *Moore v. United States*, 374 A.2d 299 (D.C.1977).

5700 by 1987.[19] The first case involving a felony drug trafficking prosecution, which addressed the issue of the quantity of a controlled substance necessary for conviction, was *Wishop v. United States,* 531 A.2d 1005 (D.C.1987), which we will examine at length later in this opinion. In the meantime, however, two DC–CSA misdemeanor possession prosecutions raising the issue had come before the court. In *Hawkins v. United States,* 482 A.2d 1230, 1233 (D.C.1984), it was assumed, without any discussion to the contrary, that the *Edelin* usable amount requirement, which came into existence under the UNA, also applied to possession charges under the DC–CSA. The following year, we reviewed another case involving a possession charge where the government's evidence showed that appellant sold a packet of heroin to an undercover police officer. *See Harris v. United States,* 489 A.2d 464 (D.C.1985). Although there was no claim in that case that the quantity was insufficient to support a conviction, we again observed that *Edelin* required a showing of a usable amount. *Id.* at 470. Thus, in neither *Hawkins* nor *Harris* was the question asked: Does the DC–CSA impose the same usability requirement as that required for prosecution under the UNA?

## V.

As we noted above, the second interpretative strand essentially imposes a measurability requirement.[20] It begins in the federal cases interpreting various federal narcotics statutes, wends its way through the DC–CSA, and finally joins the usability strand in *Wishop.* Before we discuss the implications of the two strands coming together in *Wish-*

op, we believe it will be helpful, as we did with the usability strand, to trace the measurability strand from its origins to the point where it impacts on prosecutions in this jurisdiction.

Congress enacted the US–CSA in 1970. One of its stated purposes was to provide "for an overall balanced scheme of criminal penalties for offenses involving drugs." H.R.Rep. No. 1444, 91st Cong., 2nd Sess. 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4567. Before the enactment of the US–CSA, federal narcotic prosecutions were undertaken pursuant to several statutes whose coverage reached only a small portion of the dangerous substances found in the narcotics marketplace. Those federal statutes, notably the Harrison Narcotics Act and the Jones–Miller Act, were repealed by the US–CSA.[21] The Jones–Miller Act barred the importation of opium, coca leaves, cocaine, and their salts and derivatives.[22] The Harrison Narcotics Act was a tax provision requiring distributors of opium or coca leaves (and their compounds, salts, derivatives, etc.) to register with the Internal Revenue Service and pay a tax. *See* Pub.L. No. 223, Chap. 1, 38 Stat. 785 (1914). The statute made it unlawful to purchase, sell, dispense, or distribute narcotics except in the original stamped packaging.

The US–CSA placed controls on a wide variety of harmful substances including many not covered by the statutes it repealed. The principal criminal offense established by the US–CSA, and the one pertinent to these cases, is the one noted above, *i.e.,* the provision making it unlawful "knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled sub-

---

**19.** Bureau of Justice Statistics, U.S. Dep't of Justice, The Prosecution of Felony Arrests, 1987 at 35 (1987).

**20.** Ironically, *Edelin* itself imposed a usability requirement only where the substance in question was a "trace," that is could "not [be] quantitatively determined"—measured—"because of minuteness." *Edelin, supra,* 227 A.2d at 399. Even so, in every reported case involving DC–CSA trafficking prosecutions where measurability was established by a chemical report showing the quantity of the contraband, we have relied upon additional factors, usually opinion testimo-

ny as to usability, in ruling that there was a usable amount. *See* cases cited at note 35 *infra.*

**21.** The US–CSA also repealed: The Marijuana Tax Act (formerly codified in 26 U.S.C. § 4741 *et seq.* (1964)) and the Narcotics Manufacturing Act of 1960 (formerly codified in 21 U.S.C. § 501 *et seq.* (1964)).

**22.** The statute applied to every person who "imports, manufactures, produces, compounds, sells, deals in, dispenses, or gives away opium or coca leaves...." Pub.L. No. 254, Title X, § 1006, 40 Stat. 1130 (1919).

stance." 21 U.S.C. § 841(a)(1). The legislative history of that provision is silent concerning the quantity necessary to support a conviction. Similarly, there was nothing in the repealed statutes or their legislative history concerning the quantities of the substance needed to secure a conviction; however, the courts interpreting the repealed statutes, for the most part, held that a measurable amount was needed.[23] No court held that more was required, and one United States Court of Appeals required less, holding that:

> [t]he prosecution need not prove the performance of a quantitative test, so long as there is sufficient evidence to allow the jury to find beyond a reasonable doubt that the substance contained heroin.

*United States v. Curbelo*, 423 F.2d 1204, 1205 (5th Cir.1970) (citation omitted). The only case from the United States Court of Appeals for the District of Columbia Circuit addressing the issue also sheds some light. *See Hinton v. United States*, 137 U.S.App. D.C. 388, 424 F.2d 876 (1969). There, the appellant, who had been convicted of both a Harrison Narcotics Act[24] and a Jones–Miller Act[25] violation for possession of 30 capsules of heroin, contended that the evidence was insufficient to convict because the exact quantity of heroin was not established in the course of the chemist's testimony. *Id.* at 394, 424 F.2d at 882. The court rejected that contention, observing:

> This court has never held that the Government must prove the specific quantum of a narcotic drug possessed by the accused as a predicate for his conviction of narcotic offenses. Here it was shown that the amount of heroin was more than a trace, and that it was capable of quantitative analysis. The chemist testified that

the powder found in the capsules contained a substantial amount of heroin, and supported his opinion with a detailed explanation of the tests he had conducted in arriving at the conclusion. We hold that this was enough to discharge the Government's burden of establishing appellant's possession of heroin....

*Id.*, 424 F.2d at 882 (footnotes omitted). Significantly, the court observed that "capable of quantitative analysis," a phrasing synonymous with measurability, is the minimum standard set forth in *Edelin*. *Id.* at 394 n. 29, 424 F.2d at 882 n. 29.

Thus, on the eve of enactment of the US–CSA by Congress, under the predecessor statutes, the federal courts had uniformly held that the most that need be proven was the defendant's connection with some measurable quantity of the banned substance. In the District that requirement was reflected in the pattern jury instruction, first promulgated in 1966, which, in defining a "narcotic drug," provided:

> The Government is not required to prove that the amount or quantity was exactly the same as that alleged in the indictment, but the Government must prove beyond a reasonable doubt that some *measurable* amount of a narcotic drug was in fact sold ... by the defendant.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 90 (1st Ed.1966) ("Red Book") (emphasis added). In addition, the pattern jury instruction generally used throughout the federal courts also specified that a measurable amount of the banned substance was all that was required. EDWARD J. DEVITT ET AL., FEDERAL JURY PRAC-

---

**23.** *See, e.g., United States v. Wanton*, 380 F.2d 792 (2d Cir.1967); *United States v. Sudduth*, 458 F.2d 1222 (10th Cir.1972); *Jordan v. United States*, 416 F.2d 338 (9th Cir.1969).

**24.** 26 U.S.C. § 4704(a), which provided in pertinent part: "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package...."

**25.** 21 U.S.C. § 174, which provided, in pertinent part:

> ·Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law ..., shall be imprisoned not less than five or more than twenty years....

TICE AND INSTRUCTIONS § 44.12 (3d ed. 1970) ("DEVITT & BLACKMAR").

After the US–CSA was enacted, one of the first United States Courts of Appeals to consider the usable/measurable amount issue was one involving an appeal from a conviction for possession of heroin, in violation of 21 U.S.C. § 844(a). *See United States v. Jeffers*, 524 F.2d 253 (7th Cir.1975). Two separate packages had been recovered: one containing 295 milligrams of powder of which 32 milligrams was pure heroin; the other package contained 106 milligrams of powder of which 3 milligrams was pure heroin. *Id.* at 254. On appeal, Jeffers urged the court to adopt *Edelin's* usable amount requirement. Noting that the question was one of first impression in the federal courts, the court concluded that there was no basis in either the statute itself, or its legislative history, for concluding that Congress intended to require that there be a usable amount of the substance to secure a conviction. Declining to engraft such an exception itself, the court, approving the jury instructions given in the case, held:

> The "measurable amount" standard contained in the instruction provides a bright-line, objective test for narcotics cases. This contrasts markedly with the uncertain and subjective standard that the usable quantity doctrine would provide.

*Id.* at 258. The jury instruction approved by the court provided:

> The evidence in this case need not establish that the amount or quantity of heroin was as alleged in the indictment, but only that some *measurable* amount of a heroin drug was in fact the subject of the action charged in the indictment.

*Id.* (citing DEVITT & BLACKMAR, *supra*, § 44.12) (emphasis in original).[26]

Other federal courts of appeal all either reached the same result or concluded, as one court did, that "the presence and identity of the drug is the thing and ... the quantity of it is not important." *United States v. Estell*, 539 F.2d 697, 699 (10th Cir.1976) (citation omitted). *See United States v. Spann*, 515 F.2d 579, 583–84 (10th Cir.1975) (expressly rejecting "usable amount" requirement).[27] Thus, the unanimous view of the federal courts, in the decade between enactment of the US–CSA by the Congress and enactment of the DC–CSA by the Council, was that the prosecution was required to show no more than some measurable amount of the forbidden substance in order to secure a conviction under the US–CSA. Those holdings were reflected in the second edition of the Red Book, published two years after the enactment of the US–CSA, where the instructions for simple possession, 21 U.S.C. § 844(a), distribution, and possession with intent to distribute, 21 U.S.C. § 841(a)(1), all required that, in order to convict, the jury must find beyond a reasonable doubt the presence of "some *measurable* amount of a controlled substance." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 4.31 and 4.32 (2d ed. 1972) (emphasis added).

The federal government was not alone in its legislative activity relating to regulation of controlled substances. In 1970, the National Conference of Commissioners on Uniform State Laws recommended that the Uniform Controlled Substances Act, essentially as adopted by Congress, be adopted by the states and other jurisdictions as a replacement for the UNA.[28] 9–II UNIFORM LAWS ANNOTATED 2 (West 1988). In the next two years, over thirty states enacted the CSA, and by 1981, all but a handful of the states

---

**26.** That instruction was drafted to apply to prosecution under the Harrison Narcotics Act and the Jones–Miller Act. The trial court in *Jeffers* apparently adopted it for a US–CSA prosecution and the Court of Appeals approved, ruling that it was applicable to prosecutions under that provision.

**27.** *See also United States v. Harold*, 588 F.2d 1136, 1143 (5th Cir.1979) (any measurable amount); *United States v. Picklesimer*, 585 F.2d

1199, 1203 (3d Cir.1978) (any quantity sufficient); *United States v. Eddy*, 549 F.2d 108, 111 (9th Cir.1976) (statute has no "minimum amount" requirement); *United States v. Nelson*, 499 F.2d 965, 966 (8th Cir.1974) (any measurable amount).

**28.** The other jurisdictions included the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.

and the District of Columbia had done so.[29] *Id.* at 1–2. During the decade before enactment of the DC–CSA by the Council, courts in nineteen of those states either expressly rejected the usable amount standard, adopted the measurable amount standard, or required no more than a showing of the presence of the controlled substance without regard to quantity.[30] Only three adopted (or reaffirmed) the usable amount requirement.[31] Subsequently, the courts in at least fourteen additional states adopted a standard requiring a showing of less than a usable amount.[32]

## VI.

As we can see from the above discussion, when the Council enacted the DC–CSA, it did so under circumstances where every federal court and nearly every state court interpreting the same statutory language had required no more than a measurable amount of the banned substance to support a conviction. It is against that backdrop that *Wishop* came

before this court. In that case, the court reviewed convictions of distribution of two controlled substances: 19.4 milligrams of phencyclidine (PCP) and 461.6 milligrams of marijuana, in violation of D.C.Code § 33–541(a)(1) (1986 Supp.). The Red Book, by then in the third edition, only included controlled substance instructions for violations of the US–CSA, 21 U.S.C. § 841(a)(1) (1970), which was, as we have seen, the model for the DC–CSA. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.33 (3d ed. 1978). As with the previous editions, the instruction provided that the government must prove a *measurable* amount of the controlled substance. *Id.* The trial judge, intermingling UNA and US–CSA requirements, instructed, without objection, that the government must prove a *"measurable or usable* amount of a controlled substance." *Wishop, supra,* 531 A.2d at 1007 (emphasis added and internal quotation omitted).

**29.** States adopting the CSA in the process repealed the UNA where it was in force.

**30.** *See, e.g., Hare v. State,* 53 Ala.App. 596, 302 So.2d 569, 571 (Crim.App.1974); *Wright v. State,* 154 Ga.App. 400, 268 S.E.2d 378, 380 (1980) (citation omitted), *cert. denied,* 449 U.S. 900, 101 S.Ct. 270, 66 L.Ed.2d 130 (1980); *State v. Vance,* 61 Haw. 291, 602 P.2d 933, 944 (1979); *People v. McNeely,* 99 Ill.App.3d 1021, 55 Ill.Dec. 321, 426 N.E.2d 296, 299 (1981); *Brown v. State,* 380 N.E.2d 609, 611 (Ind.Ct.App.1978); *State v. Sabater,* 3 Kan.App.2d 692, 601 P.2d 11, 13 (1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1851, 64 L.Ed.2d 272 (1980) (citation omitted); *Cain v. State,* 34 Md.App. 446, 367 A.2d 47, 49 (1977) (citation omitted); *People v. Hunten,* 115 Mich. App. 167, 320 N.W.2d 68, 69 (1982); *State v. Padgett,* 557 S.W.2d 731, 733 (Mo.Ct.App.1977); *State v. Brown,* 195 Neb. 321, 237 N.W.2d 861, 864 (1976) (citation omitted); *Sheriff v. Benson,* 89 Nev. 160, 509 P.2d 554, 555 (1973) (citation omitted); *State v. Grijalva,* 85 N.M. 127, 509 P.2d 894, 897 (Ct.App.1973); *State v. Thomas,* 20 N.C.App. 255, 201 S.E.2d 201, 202 (1973), *cert. denied,* 284 N.C. 622, 202 S.E.2d 277 (1974); *State v. Allesi,* 216 N.W.2d 805, 809 (N.D.1974); *Doyle v. State,* 511 P.2d 1133, 1136 (Okla.Crim. App.1973) (citation omitted); *State v. Johnson,* 254 N.W.2d 114, 117 (S.D.1977); *Lee v. State,* 498 S.W.2d 909, 912 (Tenn.Crim.App.1973); *State v. King,* 9 Wash.App. 389, 512 P.2d 771, 773 (1973); *Fletcher v. State,* 68 Wis.2d 381, 228 N.W.2d 708, 710 (1975) (citation omitted).

**31.** *See, e.g., State v. Murphy,* 117 Ariz. 57, 570 P.2d 1070, 1075 (1977) *(en banc )* (citations omitted); *People v. Carrasco,* 118 Cal.App.3d 936, 173 Cal.Rptr. 688, 695 (1981) (citations omitted); *Carmouche v. State,* 540 S.W.2d 701, 702 (Tex. Crim.App.1976) (citation omitted).

**32.** *Lausterer v. State,* 693 P.2d 887, 890 (Alaska Ct.App.1985) ("a person who sells or possesses for sale any amount of cocaine—regardless of how large or small—is subjected to conviction and punishment for a class B felony"); *State v. McCarthy,* 25 Conn.App. 624, 595 A.2d 941, 943 (1991) (citation omitted), *cert. denied,* 220 Conn. 925, 598 A.2d 366 (1991); *Jones v. State,* 589 So.2d 1001, 1002 (Fla.Dist.Ct.App.1991) (citations omitted); *State v. Brown,* 245 Kan. 604, 783 P.2d 1278, 1285 (1989) (citations omitted); *Commonwealth v. Shivley,* 814 S.W.2d 572, 574 (Ky. 1991) (citation omitted); *State v. McGowan,* 541 A.2d 1301, 1302 (Me.1988); *Hampton v. State,* 498 So.2d 384, 386 (Miss.1986) (citation omitted); *State v. Pike,* 134 N.H. 690, 597 A.2d 1071, 1072 (1991); *State v. Brown,* 188 N.J.Super. 656, 458 A.2d 165, 173 (Ct.Law Div.1983) (citation omitted); *People v. Mizell,* 72 N.Y.2d 651, 536 N.Y.S.2d 21, 23, 532 N.E.2d 1249, 1251 (1988) (citations omitted); *State v. Daniels,* 26 Ohio App.3d 101, 498 N.E.2d 227, 228 (1985); *State v. Goldsmith,* 301 S.C. 463, 392 S.E.2d 787, 788 (1990) (citations omitted), *cert. denied sub nom. Witkowski v. Goldsmith,* — U.S. —, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993); *State v. Warner,* 788 P.2d 1041, 1043 (Utah Ct.App.1990) (citation omitted); *State v. Williams,* 62 Wash.App. 748, 815 P.2d 825, 826 (1991) (citation omitted), *rev. denied,* 118 Wash.2d 1019, 827 P.2d 1012 (1992).

On appeal, Wishop argued that the trial court erred in including the term "measurable" in the instruction, contending that by doing so the government could avoid proving the substance was usable as required by *Edelin.* The government did not respond, as might be expected, given the history of the CSA outlined above, that because that prosecution was pursuant to the DC–CSA rather than the UNA, the usability requirement may no longer be the appropriate standard. Nor did it argue that the *Edelin* standard had been imposed pursuant to a statute that had been repealed and replaced by a comprehensive statutory scheme with a substantial interpretative underpinning in both federal and state courts. Rather than arguing that Wishop had been convicted for a violation of a new statute with a different requirement with respect to quantity, the government simply contended that the "law in this jurisdiction is that a measurable amount of a controlled substance *is* a usable amount." [33] We rejected that argument, relying on our precedents holding to the contrary; however, we affirmed the conviction because there had been no objection to the instruction and because there had been expert testimony that the amounts of the controlled substances were in fact usable.

Judge Steadman, concurring separately, raised a point that had not been addressed by the parties. He was of the view that, assuming it was appropriate to impose the usability standard in a simple possession case,[34] there was no basis for doing so in a case where there had been a sale by the accused to an undercover police officer. *Wishop, supra,* 531 A.2d at 1009–10 (Steadman, J., concurring). He suggested adoption of the reasoning of the California courts distinguishing sale cases from possession cases on the ground that by proving a sale the government is also proving that the quantity sold was usable for that purpose. *Id.* at 1010 (citing *People v. Diamond,* 10 Cal.App.3d 798, 89 Cal.Rptr. 126, 127 (1970)).

Adoption of the California rule discussed by Judge Steadman in his concurrence, had not been urged upon the court by the government and its application was not necessary to the decision reached. The majority, considering itself bound by *Edelin,* did not adopt it. *Id.* at 1008 n. 8 (citation omitted). Thus, the usable amount requirement became firmly embedded in the interpretive fabric of the DC–CSA.

Beginning with our decision in *Wishop* in 1987 through the issuance of the division decisions in these cases in 1992, we issued published opinions dealing with the usable amount issue in a total of twelve cases—an average of two per year. In those cases, with one exception, we rejected claims that there had been a failure to establish a usable amount. In eight of the cases the quantities of the controlled substance ranged from 19.4 milligrams to 7.233 grams, and in each we held that a chemist's report reflecting the quantity of the contraband, along with some other evidence, usually opinion testimony of an expert witness, was sufficient to establish usability.[35] In three other cases we held that

---

**33.** *Wishop v. United States,* government's Br. at 4 (emphasis added). The D.C. Circuit apparently interpreted *Edelin* in essentially the same way when it observed that if a substance "was capable of quantitative analysis," *i.e.,* if it were measurable, that met the minimum standard of *Edelin. Hinton, supra,* 137 U.S.App.D.C. at 394 n. 29, 424 F.2d at 882 n. 29. The government did not cite *Hinton* in its brief in *Wishop.* Nor did it cite any of the federal or state cases holding, under the Controlled Substances Act, that the government need show no more than a measurable amount.

**34.** Judge Steadman expressed skepticism on this point as well; however, since the issue was not directly presented, he did not address it.

**35.** *See Washington, supra,* 619 A.2d 30 (7.233 grams of 92% pure cocaine plus testimony that the contraband was packaged in a manner consistent with distribution); *Thomas, supra,* 619 A.2d 20 (160 milligrams of 93% pure rock cocaine plus expert testimony); *Barnes v. United States,* 614 A.2d 902 (D.C.1992) (30 milligrams of cocaine plus expert testimony); *Johnson v. United States,* 611 A.2d 41 (D.C.1992) (140 milligrams of which 93% was crack cocaine plus expert testimony); *Gray v. United States,* 600 A.2d 367 (D.C.App.1991) (27.8 milligrams of cocaine plus expert testimony); *Judge v. United States,* 599 A.2d 417 (D.C.1991) (187 milligrams of which 91% was cocaine plus expert testimony); *Davis v. United States,* 590 A.2d 1036 (D.C. 1991) (144 milligrams of which 97% was cocaine plus expert testimony); *Wishop, supra,* 531 A.2d 1005 (19.4 milligrams of PCP and 461.6 milligrams of marijuana plus expert testimony). In each instance in the above cases where "expert testimony" is referenced, the evidence came in

usability could be established by circumstantial evidence.[36] We reversed a conviction in the remaining case where the testimony showed 70 milligrams of a white powder with a "small amount" of heroin. No evidence of the exact quantity was provided, and likening the circumstances to cases involving only trace amounts, we concluded that the government had failed to establish there was a usable amount. *See Singley v. United States*, 533 A.2d 245, 248 (D.C.1987) (per curiam).

In sum, beginning with *Wishop*, we have affirmed[37] every conviction where the quantity of the controlled substance was established either by circumstantial evidence or by proof that the amount was measurable.[38] We reversed in the only case where no evidence of measurability was presented. Indeed, since, and including *Edelin*, we have held that the government presented insufficient evidence of quantity on only four occasions, and in each case there was no evidence that the accused was connected to a measurable amount of the substance. *See Edelin, supra*, 227 A.2d 395 (traces); *Marshall, supra*, 229 A.2d 449 (traces); *Payne v. United States*, 294 A.2d 501 (D.C.1972) (no chemical test at all); and *Singley, supra*, 533 A.2d 245 (no quantitative analysis). Thus, even though we have been labeled as a usable amount jurisdiction, we have, in practice, imposed a measurable amount standard be-

cause we have never failed to uphold a conviction where there was either direct or circumstantial evidence that there was a measurable quantity of the substance in question, and we have always reversed the conviction when the government has failed to show measurability. In reaching that state, however, there have been countless hours expended on what, in reality, has become a non-issue. The usability standard has provided no greater protection to those charged with drug offenses than the measurability standard would have, and the police, prosecutors, defense attorneys, trial judges, and appellate judges have devoted considerable time and expense dealing with an issue that has no useful impact upon the administration of justice. Moreover, some of our decisions have been difficult to reconcile with each other, thus engendering unnecessary confusion and uncertainty.[39]

■ The reality that we have been, in effect, a measurable amount adherent might be enough by itself to persuade us to abandon the usability standard. We need not decide this issue on that basis, however, because we are persuaded that the Council's intent in this regard can be determined from other sources. First, returning to the principles of statutory construction discussed earlier, we note that under *McReady, supra*, 618 A.2d 609, there is a presumption that the Council intended to apply the interpretation

the form of opinion testimony by a police officer, who had been qualified as a narcotics expert, that the amount in question constituted a usable amount.

36. *See Thorne v. U.S.*, 582 A.2d 964 (a "quarter" of heroin was sold in a glassine bag customarily used for sales of a usable amount and the buyer was observed attempting to inject the contents of the bag); *Bernard v. United States*, 575 A.2d 1191 (D.C.1990) (usability of substance sold to a customer, but not recovered, was circumstantially established by showing that similar packets from the stash from which the dispensed substance came contained a usable amount); *Brown v. United States*, 542 A.2d 1231, 1233 n. 2 (D.C. 1988) (usability established by testimony that defendant was seen smoking cigarette containing marijuana; however, conviction reversed on other grounds).

37. In *Brown, supra*, we held that usability was established by circumstantial evidence, but reversed on another ground.

38. In addition, in a rough count of the unpublished opinions issued by the court in 1992 and 1993, we found at least six cases in each of those years where we rejected a claim that the government failed to prove a usable amount. In each, the actual quantity of the controlled substance was proven and thus there was a measurable amount.

39. *Compare Brown, supra*, 542 A.2d at 1233 n. 2, and *Richardson, supra*, 366 A.2d at 434 (observation that defendant was smoking substance enough to establish usability) *with Payne, supra*, 294 A.2d at 513 (fact that defendant seen smoking a cigarette allegedly containing marijuana insufficient to establish usable amount). We also note the strong disagreements that have been expressed concerning an expert witness's testimony defining the term usable amount. *Compare Gray, supra*, 600 A.2d at 369, *with Thomas, supra*, 619 A.2d at 26–27 (majority opinion) and 28–29 (concurring and dissenting opinion).

regarding quantity reached by the federal courts, *i.e.*, the measurable amount standard. On the other hand, applying the *Lorillard, supra*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 principle relating to the meaning of similar terms in other statutes enacted by the same legislative body, the application of the presumption would result in a reaffirmation of the usable amount standard. We have found no cases where the application of these two principles has produced the clearly different results reached here. It appears to us, however, where the Council has adopted a federal statute virtually in its entirety, as it did when it enacted the DC–CSA, that the *McReady* presumption should prevail. That is especially so since the *Edelin* standard applied to a statutory provision covering a much narrower range of activity than the DC–CSA, *i.e.*, possession of narcotics.[40]

That conclusion is buttressed by legislative history which persuades us that even though the Council did not express itself directly on the point, it intended the measurable amount standard should apply. The basis for that conclusion is language demonstrating that the Council, in enacting the DC–CSA, intended to conform District law relating to controlled substances to that of the federal government and the states.

The DC–CSA was reported to the Council by its Committee on the Judiciary, which expressed itself in the following manner in that portion of its report where it explained the purpose of and need for the legislation:

> This bill seeks to achieve a greater degree of *uniformity* between federal laws, District laws and the laws of those states which have enacted uniform controlled substance laws. Such uniformity will provide law enforcement officials with more

efficient tools for combatting drug abuse and drug dependence and will close the current gaps in the District's control over potentially dangerous substances.

\* \* \* \* \* \*

> Finally, enactment of the CSA *would bring the law of the District of Columbia into substantial conformity* with the *federal law* in this area *and* with *the laws of those states* which have adopted the uniform law drafted by the National Conference of Commissioners on Uniform State Laws. To date, 42 states have passed such uniform legislation in whole or in part, including Maryland, Virginia, Delaware, and North Carolina. Uniformity is an important goal of this legislation since it will facilitate more effective governmental control over the problems of drug abuse and drug dependence.

REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON THE JUDICIARY ON BILL 4–123, PROCEEDINGS REGARDING THE DISTRICT OF COLUMBIA UNIFORM CONTROLLED SUBSTANCES ACT OF 1981, at 1–3 (April 8, 1981) (emphasis added). We think it clear from this language that it was intended that the law of the District of Columbia be in conformity with the law of the federal government and the states that had also adopted essentially identical legislation. In short, the Council has signaled that it wishes to be bound, as *McReady* holds, by authoritative interpretations of the US–CSA by the federal courts, which have overwhelmingly, although not unanimously, required the showing of no more than a measurable amount of the substance in question.

The government argues that even a measurable amount standard requires more than is necessary under the statute.[41] It main-

---

**40.** *See Jones v. United States*, 271 A.2d 559 (D.C. 1970), where this court rejected the *Edelin* usable amount requirement in prosecutions under the provision, then in force, forbidding presence in a premises where narcotics were sold in violation of D.C.Code § 22–1515(a) (1967).

**41.** The most recent edition of the Red Book unaccountably provides that in federal controlled substance prosecutions, the government must prove the defendant possessed "a *detectable* or measurable amount" of the controlled substance. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUM-BIA No. 4.28, alternative B (4th ed. 1993) (emphasis added). There is no explanation for the addition of the word "detectable" except for citation to some federal cases and the current edition of DEVITT & BLACKMAR, none of which provide support for the change. For example, all of the cases cited applied a "measurable amount" standard. *See United States v. Walker*, 720 F.2d 517, 518 (8th Cir.1983) (citation omitted); *United States v. Woods*, 568 F.2d 509, 512 (6th Cir.) (citations omitted), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978); *United States v. Jeffers*, 524 F.2d 253, 258 (7th Cir.1975) (citing

tains that since the statute forbids possession or distribution of "a controlled substance" any amount of the controlled substance is sufficient without regard to quantity. Indeed, some of the federal cases support that view; however, a comfortable majority requires that there be a measurable amount.[42] The government finds support for its position in the language of some of the controlled substance schedules of the DC–CSA as defining controlled substances as "any quantity" of various substances.[43] We do not find that argument convincing.

The Act divides controlled substances into five different categories designated as "Schedules," with Schedule I being the most dangerous and Schedule V the least dangerous. Each schedule is itself subdivided with a listing of the controlled substances themselves, followed by separate listings for derivatives, salts, isomers, and salts of isomers of the controlled substance, which is then followed by a listing of "any material, compound, mixture, or preparation which contains any quantity of the [listed controlled substance]." *See, e.g.,* D.C.Code § 33–514(3). It is only in the latter category that the term "any quantity" is included and we are not persuaded, in light of its context and the absence of any similar reference elsewhere in the statute, or of any explanation for that formulation rather than what is contained elsewhere, that the language relied upon supports the view that the term "a controlled substance" in § 33–541 means that any amount, no matter how insubstantial, is enough to meet the statutory requirement.

*Amicus,* on the other hand, argues that it is not enough that there be a showing of a mere measurable amount, since there are circumstances when even the presence of a measurable amount of a controlled substance would result in unjust convictions because of the minute quantities involved. *Amicus* points specifically to *United States v. One Gates Learjet, Serial No. 28004,* 861 F.2d 868 (5th Cir.1988), a case involving the forfeiture of an airplane alleged to have been used to transport cocaine. In that case government agents vacuumed the airplane with special equipment and recovered 4 milligrams of cocaine—certainly a measurable amount. The court applied the usable amount standard, however, and denied the request for forfeiture. It relied, in large part, on testimony by the government chemist that the cocaine recovered could only have been discovered by the complicated scientific procedures employed and the chemist's concession that the substance could easily have been tracked onto the airplane on the shoes of passengers or crew members. *See id.* at 871–72.

The danger of unjust convictions involving extremely small but measurable amounts can be avoided, however, without imposing a usable amount standard. In the lead federal case decided shortly after enactment of the US–CSA, *Jeffers, supra,* 524 F.2d at 257, the court directly addressed that question and concluded that requirements concerning proof of the "knowledge" element of the offense are sufficient to prevent unjust convictions where a defendant is connected to very small amounts. The *Jeffers* court found support for that view in *People v. Aguilar,* 223 Cal.App.2d 119, 35 Cal.Rptr. 516 (1963), which reversed the conviction for possession of heroin where the defendant, much like the defendant in *Edelin,* was found in possession of a narcotics kit containing traces of heroin. The *Jeffers* court quoted with approval the following passage from *Aguilar:*

> It is not scientific measurement and detection which is the ultimate test of the known possession of a narcotic, but rather the awareness of the defendant of the presence of the narcotics.

*Jeffers, supra,* 524 F.2d at 258 (citing *Aguilar, supra,* 35 Cal.Rptr. at 519). Thus, the risk of convictions involving extremely small amounts, even though measurable, is signifi-

---

DEVITT & BLACKMAR, *supra,* § 44.12); *Jordan v. United States,* 416 F.2d 338, 344 (9th Cir.1969) (citation omitted); *United States v. Wanton,* 380 F.2d 792, 795 (2d Cir.1967). Moreover, the current edition of DEVITT & BLACKMAR, also requires only that a "measurable amount" be proven. *See* 2 DEVITT & BLACKMAR § 54.14 (4th ed. 1990).

**42.** *See* cases cited *supra* note 27, and accompanying text.

**43.** *See* D.C. §§ 33–514(3), –514(4), –516(3), –516(4), –518(a)(1), –518(a)(2), and –520(a)(1) to –520(a)(4).

cantly minimized, if not eliminated, by the requirement that the government must always show that the defendant "knowingly and intentionally" possessed the controlled substance.[44] *See United States v. Hubbard,* 429 A.2d 1334, 1338 (D.C.) (citations omitted), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Jones, supra* note 31, 589 So.2d at 1003 (quoting *Aguilar, supra,* 35 Cal.Rptr. at 519); *Mizell, supra* note 31, 532 N.E.2d at 1252 (citation omitted); *Daniels, supra* note 31, 498 N.E.2d at 228; *Goldsmith, supra* note 31, 392 S.E.2d at 788 (citations omitted).

Finally, we note that the convictions here were for drug trafficking offenses, while *Edelin* was a simple possession case. We see no basis for different standards for the two types of offenses and none of the federal or state authorities do either. Indeed, *Jeffers* was itself a possession case. We conclude, therefore, that the new standard we adopt today should apply to all violations of the DC–CSA.

## CONCLUSION

■ We hold that the usable amount requirement set forth in *Edelin* does not apply to prosecutions pursuant to D.C.Code § 33–541(a)(1) and (d). Hereafter, for prosecutions under those provisions, for offenses committed after the date of this opinion, the government must show either by direct or circumstantial evidence that the substance in question contained a measurable amount of a controlled substance.[45] We would expect that the government would ordinarily meet its burden, as it has done in past prosecu-

tions, simply by producing a chemist's report showing the weight of the controlled substance in question. Alternatively, where there has been no quantitative analysis, the government can meet its burden by showing as it did in *Brown, supra,* 542 A.2d at 1233 n. 2, and *Richardson, supra,* 366 A.2d at 434, that the contraband was used[46] as a controlled substance.[47] Finally, the trial court need only instruct, pursuant to the third edition of the Red Book, that the government must show beyond a reasonable doubt that defendant was legally connected in the manner charged with a "measurable" amount of a controlled substance.[48] *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 4.31, 4.32, and 4.33 (3d ed. 1978).

In No. 91–CF–113 the government presented both a chemist's report showing that the substance distributed weighed 160 milligrams of which 93% was crack cocaine, and opinion testimony that the quantity constituted a usable amount. In No. 91–CF–818 a police officer recovered a stash containing 7.233 grams of a substance of which 92% was cocaine; there was also testimony that the seized contraband was packaged for distribution and that the accused had been observed, before the stash was seized, selling a packet taken from that stash. In each case the division held, based on that evidence, that the government had established that the usable amount requirement had been met. We agree. Further, in each case the division rejected other claims raised and we hereby reinstate those portions of the division opinions resolving those claims adversely to appellants. *Thomas, supra,* 619 A.2d at 22 n. 1

---

44. The *Jeffers* court also observed that:
    An adequate instruction on what inferences with regard to a defendant's knowing possession can be drawn from the fact of physical possession of a controlled substance in such circumstances solves the problem without reference to the "usable quantity" doctrine.
    *Id.* at 257.

45. *See Bowyer v. United States,* 422 A.2d 973, 981 (D.C.1980) (decision altering "the legal rules of evidence to require less testimony" to convict, applies only to offenses committed after the decision was rendered).

46. As is clear from our own cases and those from other jurisdictions considering the question, if a substance is usable it is also measurable. Thus,

where the government has established usability it will also have established measurability.

47. Similarly, measurability could be established by showing, as the government did in *Bernard, supra,* 575 A.2d at 1194, that the unrecovered (and therefore unmeasured) substance, which is the subject of the prosecution, came from a source which did contain a measurable amount.

48. Although it would not ordinarily be necessary to instruct the jury any further on that point, the term measurable is defined as capable of being measured or quantified.

and Part II; *Washington, supra,* 619 A.2d at 31 n. 1. Accordingly, the judgments in both cases are *affirmed.*

No. 91–CF–113 *Affirmed.*

No. 91–CF–818 *Affirmed.*